768 A.2d 795

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. L. P., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 16, 2001—Decided March 16, 2001.

Before Judges HAVEY, WEFING and LEFELT.

*Espey & Szabo*, attorneys for appellant (*Robert A. Obler*, of counsel, *Mr. Obler* and *Helen E. Szabo*, on the brief).

*John J. Farmer, Jr.*, Attorney General, attorney for respondent (*Marcy H. Speiser*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

LEFELT, J.A.D.

A Mercer County jury convicted defendant L.P. of two counts of first-degree aggravated assault and of endangering a child's welfare for sexually penetrating his niece, Lucy (a fictitious name), during two separate time periods when Lucy was less than thirteen years old and when she was older than thirteen but less than sixteen. *N.J.S.A.* 2C:14-2(a); *N.J.S.A.* 2C:24-4(a). While defendant's assaults preceded and included the time periods for

which L.P. was indicted and convicted, he was charged solely with those assaults commencing on the date of his eighteenth birthday. After merging the endangering convictions into the aggravated assaults, Judge Sapp Peterson sentenced defendant to two consecutive sixteen-year terms of imprisonment.

Defendant appealed, challenging his convictions and sentence. The most troubling trial error alleged by defendant relates to the State presenting evidence that defendant sexually abused Lucy before the two periods charged in the indictment. After considering this allegation together with all other alleged points of error, however, we nevertheless affirm.

Defendant's niece, Lucy, was twenty-five years old at the time of trial. When Lucy was eight years old and defendant was fifteen or sixteen, in about 1979, she alleged that the assaults began. They began at her grandmother's house, where her uncle lived, during a six-month period when she and her family were temporarily living with her grandmother.

One evening after dinner, Lucy was having a bath when defendant entered the bathroom and asked if he could wash her back. She agreed and, after washing her back, defendant touched her vagina and chest. Lucy was "shooken" and called for her grandmother, who came into the room. Defendant left the bathroom but Lucy did not tell her grandmother what defendant had done because she "was scared" and "really wasn't sure what happened" to her. Her grandmother was the only other adult in the house at the time.

The next assault occurred the following weekend. While at her grandmother's home, Lucy slept in her grandmother's bedroom. She went to bed at her usual time of 8:00 p.m. Her grandmother was downstairs watching television. Defendant came into the room five minutes later, gave her a hug, told her "it was allright," and put his hand in her vagina. He licked his hand, and then climbed on top of her and "raped" her. She begged him to stop and told him he was hurting her. Defendant responded that he was going to "pee" inside her, which he did. Then he got up,

telling Lucy that if she told anybody, he would say it was her fault. He threatened to hurt Lucy, and her mother and father. Lucy did not tell her grandmother what happened when her grandmother came up to sleep because she believed defendant's threats.

The next day Lucy found "a lot" of dried blood on her underwear and legs when she went to the bathroom. Her vaginal area was "burning," and "hurt" and "felt like it had been torn." She called down to her grandmother and told her about the blood. Her grandmother just told her to "put on a pad." Lucy trusted her grandmother and "thought the world of her." That night, Lucy told her mother about the blood. Lucy testified that her mother said the "[s]ame thing my grandmother did, to put on a pad." (Lucy did not actually begin menstruating until she was fourteen.)

On another weekend shortly after these incidents, Lucy was playing in the basement and defendant came downstairs. He laid her down on a pile of clothes and raped her again. Lucy testified: "I was screaming, and I was telling him no, and he just kept going and going. Then he said he was going to pee and he got up off me and that was it, and he always reminded me that, remember what [he] said, and then [']you're my girl[']." Lucy believed that no one else was in the house because she was screaming and no one came to help her.

After six months, Lucy's family moved to nearby Hamilton. Lucy's parents would drop off Lucy and one of her brothers at her grandmother's home for an overnight stay, every Friday and Sunday when they went bowling. The children also stayed at her grandmother's home when Lucy's parents went to weddings or other events of that nature. This arrangement continued until Lucy was twelve or thirteen when, first, her other grandmother, and then her other uncle, moved into Lucy's home and took over babysitting responsibilities.

The assaults occurred every weekend that Lucy was at her grandmother's house, about fifty times, until she was twelve years

old. Defendant would penetrate her and ejaculate each time, telling her he was going to "pee" inside her. Most of the assaults occurred in Lucy's grandmother's room, just after Lucy went to bed, or in the bathroom. Her grandmother would be in the kitchen or living room downstairs. On occasion, they could hear her grandmother coming upstairs, and defendant would get out of bed and run into the bathroom.

Defendant "was very dirty" and smelled "really bad," like alcohol or "dirty feet." He had "green teeth" and Lucy would turn away when he tried to kiss her. He covered her face with his hand or a pillow if she yelled or screamed during the rapes. After the rapes, defendant would go into the bathroom.

When Lucy would tell him to stop, defendant told her "to be quiet." Eventually, Lucy "just let it happen" because she knew she "couldn't do anything to stop him." She "use[d] to stare off at whatever was there . . . the closet door or the window, just trying to . . . make time go by faster." After the assaults, defendant would tell Lucy that she "was his girl," kiss her on the head, and "walk out like nothing ever happened." Around the age of twelve, Lucy stopped sleeping at her grandmother's house.

In August or September 1986, however, when she was fifteen, Lucy stayed with her grandmother while her family went on a camping trip. Lucy fell asleep on the couch. Defendant came home at around 11:00 p.m., smelling of alcohol, and he lay next to her. Lucy pushed defendant off the couch, but he got up, unbuttoned her jeans, and raped her. She struggled in the beginning, but after a while she "just let it happen" because, she said, "I knew there was nothing I could do to stop him because I could never stop him before."

Lucy complained about this last incident to her boyfriend at the time, T.S. She told T.S. "everything that was done to me" and specifically described the latest incident. T.S. became very upset and subsequently confronted defendant about the rape. According to Lucy, defendant assured T.S. that "it would never happen again." Lucy did not inform the police because she was still afraid

of defendant and "figured [T.S.] took care of it and everything was going to be fine." She dated T.S. for another seven months.

When Lucy was sixteen, she told A.M., her best friend at the time, about the abuse, and that T.S. promised "nothing would ever happen" to her, but she was unable to rid herself of the memories. About three months later, when she was seventeen, Lucy told M.P., her teacher, about the abuse. He told her that she should call the police and tell her parents, but she "wasn't ready to deal with all of that." Nonetheless, shortly thereafter, Lucy told her mother that defendant had raped her and she "couldn't deal with it alone anymore." Lucy's mother wanted to confront her grandmother, but Lucy did not want her grandmother to know because she was afraid of ruining their relationship. Her mother suggested that Lucy tell her father, which she did immediately thereafter.

Lucy went away to culinary arts school in Atlantic County. One night when she was eighteen or nineteen years old and away at school, Lucy "was having a few drinks" and took a Valium to calm down because she had become very upset thinking about the abuse. She called defendant and he remembered what he did to her when she was younger. Lucy thought that defendant's admission would put her mind at ease, but it did not.

When she was twenty-one years old, Lucy moved to Trenton, near her grandmother's home. She often drove by her grandmother's house and one day saw a little girl at the house. She became concerned about the little girl and told the girl's mother, defendant's girlfriend, about her concerns and that she had been abused. A few days later, Lucy called a number she saw in a public service announcement about child abuse.

As a result of her call, Lucy received an angry telephone call from her grandmother. Defendant also called her and he seemed "angry" and "scared at the same time."

A couple of days later, Lucy went to the Trenton police with A.M. She told the police that she had been abused when she was

younger, and that she was worried about defendant's girlfriend's daughter.

Defendant was arrested and in due course came to trial. After being convicted and sentenced, he appealed to this court. In his appeal, the defendant raised the following six points for our consideration:

POINT I TRIAL COUNSEL'S ELICITING EXPERT TESTIMONY RE-GARDING THE EXTREME RARITY OF FALSE CHILD SEXUAL ABUSE ALLEGATIONS, WHOSE OCCURRENCE WAS LIMITED TO MATRIMONIAL MATTERS AND FAILURE TO PRODUCE A DEFENSE TO COUNTER THE STATE'S EXPERT'S TESTIMONY, THE PROSECU-TOR'S TRACKING THE EXPERT'S TESTIMONY WITH FACTUAL DE-TAILS OF THE VICTIM'S ACCOUNT AND OTHER RELATED ERRORS DENIED DEFENDANT THE RIGHT TO A FAIR TRIAL AND THE EF-FECTIVE ASSISTANCE OF COUNSEL UNDER THE FEDERAL AND STATE CONSTITUTIONS (partially raised below).

POINT II THE TRIAL COURT'S EXCLUSION OF EVIDENCE OF THE VICTIM'S PRIOR SEXUAL CONDUCT AND PRECLUSION OF HER AR-REST AND PROBATIONARY STATUS RESULTING FROM HER EARLI-ER FALSE CLAIM OF RAPE BY ANOTHER VIOLATED DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL CONFRONTATION, CROSS EXAMINATION AND FAIR TRIAL RIGHTS.

POINT III THE STATE IMPROPERLY PRESENTED TESTIMONY BY A FRESH COMPLAINT WITNESS THAT VOUCHED FOR THE CREDIBILI-TY AND THE VERACITY OF THE VICTIM AND DEFENSE COUNSEL WAS INEFFECTIVE IN ELICITING TESTIMONY FROM THE STATE'S FRESH COMPLAINT WITNESS THAT THE VICTIM WAS A TRUTHFUL PERSON (not raised below).

POINT IV TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO PRES-ENT EXPERT TESTIMONY REGARDING THE EFFECT OF ALCOHOL AND ANTI–DEPRESSANTS ON THE MEMORY OF THE VICTIM, THEREBY DENYING DEFENDANT THE RIGHT TO A FAIR TRIAL AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS (not raised below).

POINT V THE TRIAL COURT IMPROPERLY ADMITTED PREJUDICIAL OTHER CRIMES EVIDENCE UNDER THE GUISE OF *RES GESTAE* TESTIMONY, FAILED TO CONDUCT THE REQUISITE HEARING AND TO GIVE THE APPROPRIATE LIMITING INSTRUCTIONS.

POINT VI THE LOWER COURT'S SENTENCE TO CONSECUTIVE TERMS OF IMPRISONMENT CUMULATING 32 YEARS, WHICH EXCEEDED THE PRESUMPTIVE TERM AND ITS REFUSAL TO SENTENCE DE-FENDANT TO ONE DEGREE LOWER WERE NOT IN ACCORDANCE WITH THE SENTENCING GUIDELINES OF THE CODE.

## I.

In our view, the most troublesome issue raised by defendant is contained in Point V. Defendant complains that the trial court admitted evidence of defendant's sexual assaults upon Lucy that were committed before the dates charged in the indictment. He contends that the acts were too distant in time to comprise *res gestae* evidence, and moreover, the evidence was inadmissible under *N.J.R.E.* 404(b), as other-crimes evidence. Moreover, defendant contends that the court's failure to conduct a hearing to determine admissibility under *N.J.R.E.* 404(b), and its failure to provide pertinent limiting instructions were reversible errors.

Evidence of "other crimes, wrongs, or acts" may not be introduced "to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *N.J.R.E.* 404(b).

Obviously, this type of evidence while probative is also quite prejudicial, creating difficulties for any jury attempting to discern its proper use. *State v. Stevens*, 115 *N.J.* 289, 309, 558 *A.2d* 833 (1989). Consequently, "trial courts should take pains to instruct juries carefully and comprehensively" on the limited use of such evidence "with ample reference to the specific evidence and issues" present in the case. *Ibid.* The trial judge instructed the jury during her final charge in this case as follows:

> Additionally, the Court points out to you that with respect to Counts 1 and 2 you have heard testimony as to alleged acts of sexual assault committed by the defendant, [L.P.], against [Lucy] prior to the dates alleged in Counts 1 and 2.
>
> Again, these two counts allege that the defendant committed acts of aggravated sexual assault and endangering the welfare of a child between August 19th, 1982 and February 18th, 1984. You will recall that you have heard testimony from [Lucy] regarding incidents of aggravated sexual assault dating back to 1979. This testimony was permitted for the sole purpose of relaying to you the entire background and circumstances surrounding the allegations contained in Counts 1 and 2.

However, in order to find the defendant guilty of Counts 1 and 2 of the indictment, you, the jurors, must be convinced beyond a reasonable doubt that the crimes alleged in these counts actually occurred during the time period between August 19th, 1982 and February 18th, 1984.

■ Defendant is correct that, even if evidence of defendant's assault of the victim before his eighteenth birthday constituted admissible other-crimes evidence, these instructions were insufficient to direct the jury on the permissible use of that evidence. At no point was the jury cautioned that it could not use the testimony concerning the earlier, uncharged assaults to establish defendant's criminal predisposition. *State v. G.S.*, 145 *N.J.* 460, 474, 678 *A.*2d 1092 (1996); *State v. Stevens, supra*, 115 *N.J.* at 309, 558 *A.*2d 833.

To the contrary, by informing the jury that the testimony provided "background" for the charges at issue, the court invited the jury to rely on the uncharged assaults to support the conclusion of guilt. Thus, the jury instruction was insufficient to protect defendant's right to a fair trial assuming that evidence of the earlier assaults constituted admissible other-crimes evidence.

■ In contrast to other-crimes evidence, however, *res gestae* evidence relates directly to the crime for which a defendant is being tried, rather than involving a separate crime. *State v. Martini*, 131 *N.J.* 176, 242, 619 *A.*2d 1208 (1993), *cert. denied*, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995). "[I]ts admission serves to paint a complete picture of the relevant criminal transaction." *Ibid.* Thus, evidence of conduct occurring "during the same time frame as the crime charged in the indictment will not be excluded if the evidence establishes the context of the criminal event, explains the nature of, or presents the full picture of the crime to the jury." *State v. Cherry*, 289 *N.J.Super.* 503, 522, 674 *A.*2d 589 (App.Div.1995). Instructing the jury on the limited uses of other-crimes evidence is unnecessary when evidence of uncharged conduct is admitted as part of the *res gestae* of the crime. *State v. Martini, supra*, 131 *N.J.* at 242, 619 *A.*2d 1208.

Here, however, the circumstances are unlike typical *res gestae* cases. The typical cases generally involve much shorter time periods, and an identifiable, overriding objective that ties together disparate conduct. For example, the Court found that excluding as other-crimes evidence an uncharged theft of the victim's car during a kidnaping and murder, and threats against the victim's wife would be "ridiculous." *State v. Martini,* *supra,* 131 *N.J.* at 240–42, 619 *A.*2d 1208. The conduct was "part and parcel" of the kidnaping. *Id.* at 240, 619 *A.*2d 1208. Although the threats and the theft occurred some hours after the initial kidnaping, they were undertaken as part of the defendant's attempt to obtain money from the victim in exchange for his safe return. *Id.* at 192–96, 619 *A.*2d 1208.

In a prosecution for cocaine distribution, testimony concerning drug transactions observed by the police within twenty-five minutes to one hour of the sales for which the defendant was tried was *res gestae* evidence. *State v. Ortiz,* 253 *N.J.Super.* 239, 244, 601 *A.*2d 735 (App.Div.), *certif. denied,* 130 *N.J.* 6, 611 *A.*2d 646 (1992). The evidence involved the same criminal event and served to explain the context of the case. *Ibid.* Although the prior sales may have been to different individuals, they occurred in a similar location and within a brief time of the sales for which the defendant was arrested. *Ibid.*

We also found that the *res gestae* of a police officer's murder outside a bar encompassed evidence that earlier the same day the defendant and others had discussed robbing the bar that evening. *State v. Cherry, supra,* 289 *N.J.Super.* at 521–522, 674 *A.*2d 589.

In this case, not only did all uncharged conduct fall outside the time frame of the indicted offenses, but also the earliest assaults about which Lucy testified occurred several years before the dates included in the indictment. In other cases involving repeated assaults on the same victim, New Jersey courts have concluded that testimony about the earlier assaults constituted other-crimes evidence.

For example, *State v. G.S., supra*, 145 *N.J.* at 462–64, 678 *A.*2d 1092, also involved repeated sexual assaults against a young child. The defendant was indicted for conduct that commenced in the spring of 1984, when the victim was twelve years old, and continued until February 1987. *State v. G.S.*, 278 *N.J.Super.* 151, 159, 650 *A.*2d 819 (App.Div.1994), *rev'd*, 145 *N.J.* 460, 476, 678 *A.*2d 1092 (1996). At trial, the prosecutor presented evidence that several years earlier, in 1982, the victim had accused the defendant of touching her genital area inappropriately and making her lie on a bed naked while he stared at her. *State v. G.S., supra*, 145 *N.J.* at 462–63, 678 *A.*2d 1092. She was placed with foster parents, and the defendant was charged with endangering the welfare of a child, but the charges were dismissed after he entered a pretrial intervention program. *Id.* at 463, 678 *A.*2d 1092. The victim's mother disbelieved her, and she later recanted and was returned to her home. *Ibid.* Six months later, in 1983, the molestation resumed and continued until 1987 on an escalated basis that included regular acts of intercourse. *Id.* at 463, 678 *A.*2d 1092. We concluded that the earlier molestations constituted other-crimes evidence, and the Supreme Court impliedly agreed. *Id.* at 469, 678 *A.*2d 1092.

In *State v. Bragg*, 295 *N.J.Super.* 459, 467–69, 685 *A.*2d 488 (App.Div.1996), defendant was charged with kidnaping and assaulting his former girlfriend. The indictment charged defendant with offenses that occurred on June 27 and 28, 1993. *Id.* at 462, 685 *A.*2d 488. At trial, however, the victim testified "in graphic detail" concerning "numerous prior occasions" during which the defendant had committed acts of physical violence against her. *Id.* at 462–63, 685 *A.*2d 488. We reversed because the evidence was inadmissible as "proof of plan," one of the purposes listed in the trial court's instruction, and the jury instruction on the use of this other-crimes evidence was inadequate. *Id.* at 468, 685 *A.*2d 488.

The circumstances of *Bragg* and *G.S.* are distinguishable from the current case, however. Each involved evidence that described

other crimes, rather than other acts pertaining to the crime for which those defendants were charged. More significantly, in both cases there was a definite break between the conduct described in the other-crimes evidence and that for which the defendant was charged.

In *G.S.*, the molestations stopped during the period when the victim was removed from her home and authorities became involved. In *Bragg*, the two-day kidnaping and the assaults that occurred during that period were distinct from the previous beatings to which the victim testified. In both *G.S.* and *Bragg*, the evidence of previous assaults more closely fell into the other-crimes category than *res gestae* evidence of the crime for which defendant was being tried.

In this case, no easy delineation can be made between any of the assaults. Once begun, the conduct continued against the same victim in the same manner until February 1984 when it ceased to occur on a regular basis, resuming only in 1986 or 1987. The assaults that occurred years before the dates in the indictment related a continuing course of conduct against the same victim as she grew older.

Other courts have recognized that the nature of child abuse prosecutions makes it difficult in some cases to extricate evidence of other uncharged conduct from testimony about abuse. *State v. Black,* 757 *So.*2d 887, 891 (La.Ct.App.2000) (evidence of other acts of sexual abuse committed upon eleven-year-old child "were so inextricably included in the victim's testimony and first report that they could not reasonably have been excluded"); *Myrick v. State,* 242 *Ga.App.* 892, 531 *S.E.*2d 766, 768 (2000) (medical evidence of sexual intercourse in prosecution for child molestation was properly admitted as *res gestae* evidence because it formed "a continuous course of conduct that's so interrelated with the other activity, it would be difficult to separate").

■ There are several reasons why we have concluded that the evidence of the prior assaults must be considered *res gestae* in this

case. If the prior instances of abuse were excluded, Lucy would have been required to recall that a specific assault occurred after defendant's eighteenth birthday, or on a particular day that fell after that event, such as her own twelfth birthday. Young children often "do not think in terms of dates or time spans." *In re K.A.W.*, 104 *N.J.* 112, 118, 515 *A.*2d 1217 (1986). Given the regularity and frequency with which the assaults occurred, it would have been highly improbable to expect the victim to differentiate the details of the thirtieth rape from the fortieth.

In addition, unlike the circumstances of *G.S.*, here the young victim's experience began with the most traumatic rape, and continued in the same manner. Under those circumstances, it is reasonable to expect that her clearest memories of a particular instance of abuse involved the initial assaults, and that she would grow increasingly less able to differentiate and recall specifics as the same traumatic events were repeated numerous times.

Most significantly, the testimony about the earliest attacks was critical to the jury's understanding of the facts and context of the crime. The jury was entitled to the whole picture in order to understand her inability to disclose the assaults at an earlier age, especially because defendant was not an authority figure in her life. Defendant had little or no coercive authority over the victim.

But, because the victim was able to explain she was only eight years old when the assaults started, and that her first complaints were met with the callous instruction "to wear a pad," the jury was better able to understand the victim's helplessness and inability to report the assaults as the years passed. A jury unaware of the history reasonably could conclude that a twelve-or thirteen-year-old girl would have understood the nature and impropriety of defendant's conduct and be expected either to have forcefully resisted him or to have approached another adult soon after the first attacks. The earlier evidence was essential to explain the victim's sense of extreme helplessness in the face of defendant's repeated assaults. In essence, the assaults constituted a continu-

ous unbroken chain of events that would be most difficult and unnatural to separate.

In addition, the testimony also permitted the jury to understand that the abuse commenced during a period when defendant's access to the victim was enhanced by the fact that she was living in his house. By the time she became a visitor, which necessarily restricted defendant's opportunities and increased the likelihood of adult interference, the modus operandi had been established and the victim's feelings of helplessness engendered, making the crimes easier to accomplish.

Thus, although the testimony was atypical *res gestae* evidence, it was essential in this case to explain the context of the crime and the victim's failure to complain until years after the assaults of 1982 to 1984. Furthermore, this evidence was presented quite differently from most "other-crimes" situations. Here, Lucy testified specifically about the first three incidents of abuse when she was eight-years old. She then generally indicated that similar abuse continued until she was twelve. She explained, for example, that "[a]bout 50" other incidents occurred. She testified that "it ... happened in the attic, it happened in the basement, it happened in my grandmother's room. It happened in the bathroom a lot of times.... He would penetrate me, and he would ejaculate every time..... [I]t happened when I was either getting a bath or it would happen after I went to bed." Then, Lucy testified specifically about the last incident when she was fifteen-years old. The evidence was thus presented as a continuous series of events that the defendant forced Lucy to endure.

Given the manner in which this proof was presented, we agree with the prosecutor who said "that this jury [was] going to ... either believe that it happened during this entire period or it didn't happen at all." The testimony about the earlier abuse did not unjustly prejudice the time period for which defendant was indicted, because the evidence was presented as a seamless series of acts. Accordingly, we conclude that the trial judge did not err

when she admitted this evidence as *res gestae* rather than other-crimes evidence.

[The remaining sections of this opinion have been redacted for publication purposes. *See R.* 1:3–3.]

WEFING, J.A.D., concurring.

I concur in the affirmance of defendant's convictions and sentence. I write separately because of my disquiet with the concept of *res gestae*, the basis utilized by the trial court and my colleagues to admit evidence that defendant's assaults upon his niece began at a time not encompassed within the indictment.

The evidential principle denominated *res gestae* has been the subject of much criticism. Commentators have repeatedly urged that it be abandoned because of its vagueness and imprecision. *McCormick on Evidence* § 268 (Strong ed., 4th ed. 1992); 2 *Wigmore on Evidence* § 218 (Tillers rev. 1983). Courts continue to cling to it, however. If we are not ready to abandon the term, we should at least adhere to its traditional requirement of events closely related in time. *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995). Here, the gap of several years between the time the victim testified that the abuse began and the time encompassed by the indictment precludes me from considering this evidence under the rubric *res gestae.*

Courts have, however, admitted evidence of other alleged wrongdoing by a defendant "where it forms part of a chain of facts so intimately connected that the whole must be heard in order to interpret its several parts." *State v. Whitley,* 17 *Ohio App.*2d 159, 245 *N.E.*2d 232, 235 (1969).

According to the victim, defendant's assaults began when he was under the age of eighteen and subject to the jurisdiction of the juvenile court. The State was entitled to present her testimony in connection with the first two counts as she said it occurred, "a single chain of facts". Absent this evidence, the jury would

have heard "essentially an incomplete version of the charged offense, as though it had occurred in a vacuum...." *Mannie v. State*, 738 *S.W.*2d 751, 756 (Tex.App. 1987) (quoting *Boutwell v. State*, 719 *S.W.*2d 164, 175 (Tex.Crim.App. 1985)). Defendant was not entitled to an arbitrary evidential shield dependent merely upon a fortuitous date of birth.