820 A.2d 70 (2003)
359 N.J. Super. 361
STATE of New Jersey, Plaintiff-Respondent,
v.
Jamal MUHAMMAD, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted November 7, 2002.
Decided April 8, 2003.
*73 Yvonne Smith Segars, Public Defender, attorney for appellant (M. Virginia Barta, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, attorney for respondent (Michael J. Williams, Deputy Attorney General, of counsel and on the brief).
Before Judges WEFING, LISA and FUENTES. *71 *72
*74 The opinion of the court was delivered by LISA, J.A.D.
Defendant, Jamal Muhammad, was convicted of third-degree unlawful possession of a hand gun, N.J.S.A. 2C:39-5b (count one), second-degree possession of a hand gun for an unlawful purpose, N.J.S.A. 2C:39-4a (count two), first-degree armed robbery, N.J.S.A. 2C:15-1 (count three), first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count four), first-degree knowing or purposeful murder, N.J.S.A. 2C:11-3a(1),(2) (count five), and second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:15-1, N.J.S.A. 2C:5-2 (count six). The judge merged felony murder with murder, for which he imposed a sentence of life imprisonment with a thirty-year parole disqualifier. The judge merged count two with counts three and six. He imposed the following sentences, all concurrent to the murder sentence: count one, five years; count three, twenty years with a ten-year Graves Act parole disqualifier, N.J.S.A. 2C:43-6c; and count six, ten years. Appropriate mandatory monetary sanctions were imposed.
On appeal, defendant makes the following arguments through counsel:
POINT I
BY ALLOWING THE PROSECUTOR TO PLAY PORTIONS OF THE VIDEOTAPED TRIAL DURING SUMMATION, THE COURT PERMITTED THE STATE'S WITNESSES TO TESTIFY TWICE AND DEPRIVED THE DEFENDANT OF A FAIR TRIAL.
POINT II
THE TRIAL COURT ERRED IN ADMITTING THE TAPE OF STEPHON DUGGAN'S PRIOR CONSISTENT STATEMENT BECAUSE THE TEMPORAL-PROXIMITY REQUIREMENT OF N.J.R.E. 803a(2) WAS NOT MET.
POINT III
THE TRIAL COURT'S FAILURE TO CHARGE "MERE PRESENCE" DEPRIVED DEFENDANT OF A FAIR TRIAL. (Not Raised Below).
POINT IV
BECAUSE EVIDENCE OF THE KENNETH HOWARD ROBBERY WAS INFLAMMATORY AND UNNECESSARY TO THE STATE'S CASE, ITS ADMISSION VIOLATED N.J.R.E. 404(b) AND 403 AND, ALONG WITH THE COURT'S ERRONEOUS AND INADEQUATE LIMITING INSTRUCTION, DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL. (Partially Raised below).
POINT V
THE TRIAL COURT'S FAILURE TO EXCUSE JUROR NO. 8 AND TO VOIR DIRE THE REMAINING JURORS AFTER JUROR NO. 8 INDICATED THAT HE HAD DISCUSSED WITH THEM HIS FEARS ABOUT BEING A DELIBERATING JUROR RESULTED IN JURY TAINT WHICH DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).
POINT VI
THE CUMULATIVE EFFECT OF THE ERRORS AT DEFENDANT'S TRIAL DEPRIVED HIM OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1 AND 10.
In a supplemental pro se brief, defendant makes the following additional arguments:

POINT I *75 THE LACK OF A PROPER IDENTIFICATION CHARGE IN THIS CASE AMOUNTED TO A FUNDAMENTAL DENIAL OF JUSTICE WHICH REQUIRES A REVERSAL AND A NEW TRIAL GRANTED.
POINT II
THE LACK OF EVIDENCE PRODUCED BY THE STATE CONNECTING DEFENDANT TO THE KILLING OF VAUGHN ROLLINS SHOULD HAVE RESULTED IN A JUDGMENT OF ACQUITTAL AT THE END OF THE STATE'S CASE.
POINT III
THE JOINT TRIAL OF CO-DEFENDANT WHOSE DEFENSES WERE INCONSISTENT SO PREJUDICED THE DEFENDANT AS TO DENY HIM HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO A FAIR TRIAL.
POINT IV
THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERROR VIOLATED THE COMMON LAW OF NEW JERSEY AND THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION. (Not Raised Below)
We reject these arguments and affirm. Points III, V and VI of counsel's brief, and all of the points in defendant's pro se brief, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). We will discuss the remaining points.

I
On October 22, 1996, Vaughn Rollins was shot and killed. For several weeks before that, defendant and his co-defendant, Na'eem Santiago, were attempting to obtain a gun. They approached Stephon Duggan, an individual known to defendant, for this purpose. Defendant told Duggan he needed a gun because "he was having problems." This apparently referred to money problems, and defendant and Santiago told Duggan they intended to use the gun to rob people. Duggan asked several people about Santiago and on October 20, 1996, met with defendant and Santiago again and agreed to give them a gun. He handed a loaded nickel-plated .38 caliber semi-automatic handgun to defendant, who then turned it over to Santiago, who placed it in his waistband. Defendant and Santiago discussed potential robbery victims. Included among them was Vaughn Rollins, but Duggan told them not to rob him because he was his cousin.
This meeting took place on the street in Atlantic City. While the three men were still together, a young man, Kenneth Howard, rode past on a bicycle. Defendant and Santiago proceeded to rob him. They wore ski masks. Santiago pressed the gun to Howard's ribs and cut him in the neck and leg with a butcher knife. They ordered Howard to remove his clothing (except his underwear, socks and shirt) and crawl under a parked truck. The two then rode off, one peddling, the other on the handlebars, on Howard's bicycle with Howard's clothes. Having witnessed this event, Duggan claims he had second thoughts about giving the gun to defendant and Santiago and claims he made several requests that it be returned.
On October 22, 1996, defendant and Santiago spent much of the day in the Venice Park section of Atlantic City. Between 7:00 and 8:00 p.m., Rollins drove up, accompanied by Anthony Jones. Defendant and Santiago were sitting together on a porch. There were between fifteen and thirty young people congregating on porches and in the street in that immediate vicinity. Jones got out of the car and went into an apartment building to visit his girlfriend. He told Rollins he would be out in ten to *76 fifteen minutes. Rollins sat in the car and was counting money.
A man later identified as Santiago approached Rollins as he sat in the car. Santiago pulled on a ski mask, brandished a handgun, and demanded Rollins give him the money. Rollins did not comply. Santiago fired one shot, which struck and killed Rollins. Immediately after the shot rang out, Santiago left the scene, leaving the view of witnesses on the street by going around the corner. Defendant proceeded around the same corner, then returned to the porch and retrieved his jacket, after which he left the area, going around that same corner in the same direction as Santiago.
Informed of the shooting, Duggan went to the hospital where Rollins lay dying. He informed Rollins' father that night that he had supplied the gun to defendant and Santiago that killed his son. Duggan contacted Santiago, who acknowledged killing Rollins, but claimed it was an accident. Later that night, Santiago went to Aaron McCoy's apartment seeking advice. He told McCoy he had killed Rollins. McCoy called a cab for Santiago, and "told him to go over the bridge, throw the gun in the water and just get lost."
Three days later, after attending Rollins' funeral, Shanita Alvarez and Sequoya Walker went to Philadelphia, where they happened to encounter Santiago at the bus station. Santiago asked them not to tell anyone they saw him and that he was leaving for "like Arizona somewhere" because the police "were trying to put a body on him," referring to Rollins. Santiago remained a fugitive until he was arrested for the murder of Rollins in Jacksonville, Florida on May 1, 1998. Several days later, defendant turned himself in to the New Jersey authorities.
Defendant and Santiago were indicted and tried together. Santiago was convicted of the same counts as defendant. Santiago has been sentenced and has appealed. His appeal proceeded separately, and in an unpublished opinion, we affirmed his conviction (A-4881-99T5). The Supreme Court denied his petition for certification. State v. Santiago, 170 N.J. 210, 785 A.2d 438 (2001). Neither defendant testified at trial. It is clear from the proofs that Santiago was the shooter.

II
The trial was conducted in a courtroom equipped with videotape as the means of officially recording the proceedings. See Condella v. Cumberland Farms, Inc., 298 N.J.Super. 531, 533, 689 A.2d 872 (Law Div.1996), for a description of this equipment. During summation, the prosecutor was permitted, over defense objection, to play portions of the trial testimony of five State witnesses. The objection interposed at trial was that this technique might place undue emphasis on the portions played and might interfere with the ability of the jurors to rely on their own recollection of the witnesses' entire testimony. Defendant claims it was error to allow the video playbacks at all. Defendant further argues, for the first time on appeal, that it was error not to have conducted a N.J.R.E. 104(a) type hearing before allowing the playbacks and not to have given a cautionary instruction.
On the latter points, because no objection was made at trial, we are guided by the plain error standard, and we will disregard the alleged error unless it is "clearly capable of producing an unjust result." R. 2:10-2. "Under that standard, defendant has the burden of proving that the error was clear and obvious and that it affected his substantial rights." State v. Morton, 155 N.J. 383, 421, 715 A.2d 228 (1998), cert. denied, 532 U.S. 931, 121 S.Ct. *77 1380, 149 L.Ed.2d 306 (2001). The error claimed must be so egregious that it "raise[s] a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
We hold it was not error to allow the playbacks, and, in the context of this case, failure to first conduct a hearing and to later give a cautionary instruction do not constitute plain error.
Jury selection and motions occurred on February 14, 2000. The trial was conducted before the jury on February 15, 16, 17, 22, 23 and 24, when deliberations began. On February 25 the jury reached its verdict. The State called twenty-three witnesses; defendant called three and Santiago called one. Immediately prior to her summation, the prosecutor announced that she intended to play excerpts of the testimony of some witnesses during her summation. Defense counsel objected, but did not request a hearing to permit them and the court to view the selected portions. The judge rejected the defense argument that the technique might improperly overemphasize the selected portions of the witnesses' testimony or interfere with the jurors' ability to recall and rely on the witnesses' entire testimony. The judge reasoned that just as counsel would be permitted to read portions of testimony from a trial transcript, so too could they use the court-supplied video, which officially records the proceedings and accurately captures the testimony, for the same purpose.
In the course of her summation, the prosecutor played portions of the testimony of five witnesses. A total of nine segments were played. Most of them ran for about two to three minutes. Their combined time was about twenty-five minutes. The prosecutor occasionally interrupted her remarks to the jury by playing these segments. Three segments of Duggan's testimony were played. Duggan was a key witness with respect to defendant. Santiago's role as the shooter was supported by substantial evidence, including eyewitness testimony identifying him as the shooter, his admission to McCoy and Duggan that he killed Rollins, and his flight to avoid prosecution. Defendant's role in the killing was more attenuated. At the time of the shooting, defendant was sitting on the porch of a nearby apartment building, along with many other people who were out in the neighborhood that evening. He had been with Santiago in the neighborhood throughout the day and left the scene after the shooting with Santiago. These circumstances alone surely would not support a conviction for Santiago's conduct.
The evidence linking defendant to the crime is derived substantially from Duggan's account of his conversations with and observations of defendant and Santiago on and before October 20, 1996, in furnishing them with a gun which they said they would use to rob people, including Rollins as a prospective target, and watching them actually use the gun to rob Howard. Howard identified Santiago, but could not identify the other masked perpetrator who robbed him. Duggan's testimony, therefore, was crucial in implicating defendant.
The prosecution acknowledged the indispensability of Duggan's account of furnishing the gun and observing the Howard robbery in its case against defendant. The judge conducted a N.J.R.E. 104(a) hearing to consider the State's proffer of the Howard robbery as "other crimes" evidence, N.J.R.E. 404(b), or, alternatively, as direct evidence of the conspiracy to commit robbery charge. With respect to defendant, the prosecutor argued: "We place him on the scene, but we do not have him moving from his spot on the porch to participate *78 directly in the robbery that occurred." She contended the probative value of this evidence "is enhanced by the absence of any other evidence that the State can offer" to demonstrate that defendant had the motive or intent to participate with Santiago in committing an armed robbery. She concluded the high probative value thus outweighed any prejudicial effect because "it is the only evidence we have, particularly against one of the two defendants."
We illustrate the prosecutor's technique by recounting, in its entirety, the video playbacks of portions of Duggan's testimony.[1] The prosecutor discussed that Duggan's credibility was subject to question because of his prior criminal record, but that his testimony should be believed because it was supported by other evidence. Such other evidence included Duggan's version of the Howard robbery, which was consistent with that given by Howard. The prosecutor said "Let's listen to what [Duggan] said about the robbery of Kenneth Howard." She then played this video excerpt of Duggan's testimony:
Q. Okay. After Jamal got the gun, gave it to Na'eem, Na'eem put it in his waistband, what didwhat did you do?
A. I walked them outside.
Q. What happened when you walked them outside?
A. We walked and talked. Came to the street and a guy rode up on a bike and said that was his friend.
Q. Who said that was his friend?
A. I'm not sure who said it.
Q. Was it either Jamal or Na'eem?
A. Yes.
Q. Okay. Go ahead.
A. Na'eem walked over to him and I seen a butcher knife. They walked around the corner.
Q. They being
A. The guy and Na'eem.
Q. And Jamal?
A. Jamal stood there and talked to me for a minute, and then I just walked off.
Q. You said you saw the butcher knife. What butcher knife?
A. I don't know what butcher knife. I just seen a butcher knife.
Q. Well, who had the butcher knife?
A. Na'eem.
Q. Had you seen it before that day on that day?
A. I remember seeing a butcher knife.
Q. That day.
A. I don'tI'm not sure if it was that day or a day before or a day after.
Q. And who had it when you saw it?
A. Na'eem.
Q. You walked away and then what happened?
A. I walked around the corner, waited a few minutes, and I walked up to like through the parking lot, and I seen the boy on the ground getting underneatheither he was getting underneath the truck or he was underneath the truck trying to get from underneath of there or

*79 Q. Describe the boy, as you refer to him, the first time you saw him. What was he wearing?
A. White jacket. That's all I can remember is a white jacket.
Q. Was he fully clothed?
A. Yes.
Q. Okay. He had something on his feet?
A. Yes.
Q. Pants?
A. Yes.
Q. A jacket?
A. Yes.
Q. Describe this young man when you saw him getting under the truck or under the truck.
A. He didn't have any cloths on.
Q. Did you see the clothes?
A. Yes.
Q. Where did you see them?
A. I believe Na'eem was holding them in his hand.
Q. Okay. What happened to the bike?
A. Jamal was holding it.
Q. Did you get todid you see thatandand what happened with the bike and the clothes? Did they give them back to the boy? Right there and then I'm talking about.
A. No.
Q. Did they take them away with them?
A. Yes.
The prosecutor then told the jury she would soon play Howard's testimony about the same event, demonstrating how Howard's version "dovetails perfectly" with Duggan's. This would establish that "[t]hese two are the people that Kenneth Howard was talking about when he says that he was robbed on the street." After her discussion of Duggan's testimony and the playing of Duggan's three excerpts, the prosecutor played Howard's version of the robbery, as given in his trial testimony.
The prosecutor discussed the efforts Duggan made to get the gun back after learning of the shooting. After several unsuccessful efforts to reach Santiago, he finally spoke to him on the phone. The prosecutor said, "This is what he has to say about that." She then played this video testimony:
Q. Did you try to get in touch with Jamal?
A. Yes.
Q. How?
A. I paged him.
Q. And what happened?
A. Took him a while to call me back. He called me back eventually.
Q. Eventually that night or eventually the next day or eventually when?
A. That night.
Q. Okay. And what happened?
A. I told him I needed that thing back. He was like yeah. I was like yeah, I need it back. He was like okay.
Q. Did you eventually attempt to get in touch with Na'eem? By the way, did he tell you that Na'eem had it at that point?
A. Yes.
Q. Did you attempt to get itdid you attempt to get in touch with Na'eem?
A. Yes.
Q. How did you do that?
A. I had paged him.
Q. Did you hear from him?
A. Yes, eventually.
Q. When is eventually?
A. I'm not sure if it's that day or early the next morning.

*80 Q. And what was that conversation?
A. I asked him for it back and he said thathold on. I asked him for it back and he saidhe said yeah. I said yeah, I need that. I had told him that my cousin had got shot and he said yeah. He said that's what I need to talk to you about. I said yeah. He was like, you know, it was a accident. It was a accident.
Later in her summation, the prosecutor commented about an inconsistency between Duggan's trial testimony and his prior statement to the police. In the prior statement, he said he and defendant were cousins, but at trial he said they were not. On redirect examination he was asked to explain this discrepancy. After noting in her summation that the defense pointed to Duggan's "lie" in attacking his credibility, the prosecutor said, "This is what [Duggan] said about the family relationship when he was allowed to clarify it." She then played this video:
Q. Dodid youStephon, you wanted to clarify something about this cousins issue with regard to you and Jamal and Jamal and Vaughn. What is it that you wanted to clarify?
A. That when I said we're cousins, I meant that we're like cousins, like I know him for a long time. His family knew my family. So we're considered to be family in that sense. That's all.
Defendant argues that allowing the prosecutor to present the jury with a "repeat performance" of witness testimony during summation is tantamount to allowing the State to call the witness a second time, giving undue emphasis to the testimony shown and, in effect, enabling the State to bolster its case by simple repetition. In essence, defendant argues that we should adopt a per se rule barring the use of this technique by the State in a criminal case. We decline to do so. Although we recognize a significant potential for abuse, we conclude that whether or not to permit the technique, by either a prosecutor or defendant, should be determined on a case-by-case basis in the sound discretion of the trial judge.
Counsel are traditionally allowed "broad latitude" in summation. Colucci v. Oppenheim, 326 N.J.Super. 166, 177, 740 A.2d 1101 (App.Div.1999), certif. denied, 163 N.J. 395, 749 A.2d 369 (2000); Diakamopoulos v. Monmouth Med. Center, 312 N.J.Super. 20, 32, 711 A.2d 321 (App.Div.1998). In criminal trials, prosecutors are given considerable leeway, and the challenged conduct must be viewed in light of the entire trial. State v. Frost, 158 N.J. 76, 82, 727 A.2d 1 (1999); State v. Feaster, 156 N.J. 1, 64, 716 A.2d 395 (1998), cert. denied sub nom., Kenney v. New Jersey, 532 U.S. 932, 121 S.Ct. 1380, 149 L.Ed.2d 306 (2001).
In their summations counsel may display in the course of making their arguments items of physical evidence that have been admitted. They may use charts and diagrams as aids. Audio and videotaped statements of defendants and other witnesses are frequently played during the trial for the jury and, when admitted into evidence, may be played during summation. All of these procedures are subject, of course, to the trial judge's supervision.
In Condella, Judge Winkelstein, then sitting in the Law Division, found it permissible, in the trial court's discretion and subject to certain safeguards, to allow a civil litigant to utilize the video play-back technique. Condella v. Cumberland Farms, Inc., supra, 298 N.J.Super. at 538, 689 A.2d 872. Relying on State v. Michaels, 264 N.J.Super. 579, 625 A.2d 489 (App.Div.), certif. denied, 134 N.J. 476, 634 A.2d 523 (1993), and authorities from other jurisdictions, he concluded trial judges *81 should be permitted to exercise discretion to monitor what may or may not be shown, balancing the benefits of showing the video against any possible prejudice to the other party. Id. at 534-35, 634 A.2d 523.
Care must be taken that the video excerpts shown during summation are not so lengthy as to constitute a second trial emphasizing only one litigant's side of the case and that the edited portions do not distort or misstate the evidence. Id. at 536, 634 A.2d 523. A N.J.R.E. 104(a) type hearing should be held in advance to assure avoidance of these potential pitfalls. Ibid. If the party proposing to use the technique is not first to sum up and does not wish to disclose in advance which excerpts are intended to be shown, the trial judge may deny or limit the application if necessary to avoid undue delay between the parties' closings, which might be prejudicial to the party who summed up previously. Id. at 537-38, 634 A.2d 523.
We agree with the conclusion reached in Condella, and discern no reason why the practice should be barred in criminal trials. We elaborate, however, on the potential pitfalls and safeguards discussed in Condella which should guide the trial judge's discretion, with particular reference to criminal trials. The use of videotape courtrooms is increasing. We are informed by the Administrative Office of the Courts that of the 101 criminal courtrooms in the State as of this writing, 25 are equipped with video equipment. Thus the issue before us is one which may arise with some frequency.
An attorney who intends to use this technique should so inform the court and all other counsel at the earliest possible time, certainly before any party sums up. If not sooner, the intent should be disclosed at the charge conference. A N.J.R.E. 104(a) type hearing should be conducted in all cases, unless the proponent has identified the excerpts to be played and opposing counsel, with knowledge of those excerpts, expressly waives a hearing with the court's approval. If the proponent is not the first scheduled party to sum up and does not wish to disclose the proffered excerpts, the proponent should advise the aggregate length of the excerpts to assist the court in minimizing delay between summations.
A trial may not be reduced to a battle of highlight films. It cannot be suggested to jurors, in opening statements or otherwise, that they will be provided in summations with highlights of the witnesses' testimony. This would, of course, conflict with the obligation that jurors pay careful attention to all of the evidence as it is presented. As stated in Condella, the excerpts may not be unduly long so as to overemphasize one side of the case. A party may not substantially present its case a second time via videotape replay. Use of the excerpts may only constitute an aid incidental to the argument of counsel. It may not be an end in itself.
Video playbacks of witness testimony during deliberations at the jury's request are commonplace. This is the only feasible method of repeating such testimony with the videotape technology. The ongoing use of this practice is a circumstance that contributes to our conclusion that a total ban of the practice during summation would be ill-advised.
However, the use by a party in summation of videotape playback of trial testimony does not stand on the same footing as a jury's request during deliberations for a playback. A jury request results from the jury's determination that the replay of the testimony of a particular witness is important to its deliberative process. In those situations, unless the jury limits its request to a particular portion of a witness' *82 testimony, the entire testimony is played back, including all direct and cross examination. State v. Wilson, 165 N.J. 657, 660-61, 762 A.2d 647 (2000). In either case the jury sees what it has requested. That is not the case where a party chooses limited excerpts as part of its argument. Thus careful supervision is required. There is no carte blanche during summation just because the jury might request, and receive, extended playbacks. In criminal trials, where much of the evidence is usually produced by the State, special care must be taken to assure that the State does not use this technique as a means of "piling on" by undue repetition of its live testimony.
As stated in Condella, editing may not be permitted to result in distortion. Skillful editing has the capacity to encapsulate the strong points of a party's case, with the corresponding capacity to give the jury a myopic view of the facts. It is the jury's function to determine the facts based on its careful and considered evaluation of all of the evidence. It is the jury's function to ascribe relative weight to the testimony of the various witnesses and the other evidence adduced at trial. Attorneys may argue which evidence they urge the jury to find more weighty. The limited use of video replays may serve as an incidental aid to such arguments. But the misuse or over-use of this technique might tend to usurp the jury's function and improperly divert the jury from its role.
Trial judges have broad discretion in setting the permissible boundaries of summations. They may permit some or all of the proposed video playbacks, or they may reject their use entirely. The determination is guided in each case by balancing the benefit to the proponent against the possible prejudice to the opposing party. Rejection may also be based on undue consumption of time, inability to avoid delay between summations, potential to confuse or mislead the jury, or any other appropriate consideration. Special caution should be exercised to avoid playback of testimony of an inflammatory nature.
The judge should give a cautionary instruction, preferably at the time the video is played during summation and again in the final charge. The judge should inform the jury that attorneys are permitted to show the video to assist in displaying what they consider significant testimony, but it is the jury's function and obligation to determine the facts based on its recollection of all of the evidence, including both direct and cross-examination of all witnesses, and jurors should not place any extra emphasis on portions of testimony played back.
In this trial, no such charge was requested and none was given sua sponte. In his introductory comments to the jury at the beginning of the trial, the judge instructed that the jurors "will be the fact-finders. So you'll find your facts from the evidence which is presented during the course of the trial." He told the jury "it's important that you pay careful attention as the evidence is presented." In his final charge, the judge reiterated that the jurors "are the judges of the facts. You've heard all of the testimony. You'll be able to consider all the other evidence. From the evidence presented, you'll decide what the proven facts are." He instructed that their recollection of the testimony is controlling, notwithstanding "the comments of counsel during the trial of this case, during the closing arguments or otherwise." He continued: "While I'm sure no attorney in this case endeavored to misstate anything that was testified to, if for any reason your recollection differs from theirs, yours again is the controlling recollection and rely on that which you recall."
*83 In charging on credibility, the judge instructed the jurors to "weigh the testimony of each witness and then determine the weight to give to it, and through that process, you can accept all of it, a portion of it, or none of it." After summarizing what the evidence in the trial consists of, the judge stated, "Whatever it is that is in evidence you've either heard from the testimony or have been presented in physical form is what you should use to decide the case."
Before playing any of the video excerpts, the prosecutor stated in her summation that "all of my comments from here on are my recollection of what happened in this trial. My recollection is not the controlling recollection. It's yours. So if you disagree with things that I have said, that I will say because youyou remember something differently, then thatthat's the important recollection, yours, not mine." She then stated she would disagree with some of the matters stated by defense counsel and "[i]t's for you to determine what actually happened in this trial."
During deliberations the jury requested the playback of the testimony of five witnesses, including three (Howard, McCoy and Brian Townsel) for which excerpts were played during the prosecutor's summation. The testimony of each of these witnesses was played back in its entirety. This ameliorated any potential prejudice from the partial playbacks of these witnesses during the prosecutor's summation and from the lack of a limiting instruction.
We have viewed the video excerpts and considered them in the context of the prosecutor's overall summation and in the context of the entire trial. Considering the length of the trial and the number of the witnesses, they were not unduly lengthy and did not overemphasize the State's case. They were not taken out of context and did not misstate or distort the testimony of the witnesses presented. They were used as an aid to the prosecutor in presenting her arguments, not as a running narrative that might tend to unfairly limit or obfuscate the trial issues. We find no abuse of discretion in allowing the playback of these limited excerpts.
In the circumstances of this case we do not find plain error in the failure to conduct a hearing to view the excerpts before they were played or in the failure to give a cautionary instruction. Had a hearing been held, the result would have been the same, namely that the prosecutor would have been permitted to play the proffered excerpts. The judge's overall instructions adequately instructed the jury to consider all of the evidence as it is presented and the entire testimony of the witnesses in finding the facts in the case. We are satisfied the lack of a cautionary instruction in this case was not clearly capable of producing an unjust result. The lack of a cautionary instruction does not raise a reasonable doubt that the jury reached a result it might otherwise not have reached. Therefore, defendant's substantial rights were not affected. State v. Morton, supra, 155 N.J. at 421, 715 A.2d 228; State v. Macon, supra, 57 N.J. at 336, 273 A.2d 1.

III
We next address the admission in evidence of a sworn, tape recorded statement given by Duggan to the police on October 7, 1997. In it he detailed his knowledge of the events surrounding the murder. It included his rendition of his furnishing the gun to defendant and Santiago and his witnessing the Howard robbery. The statement was substantially consistent with Duggan's trial testimony. He gave the October 7, 1997 statement after entering *84 into an agreement with the Atlantic County Prosecutor's Office that he would provide truthful trial testimony. Duggan had a substantial criminal record, and he was serving a State prison sentence when he entered into the agreement. The prosecutor agreed not to file any charges against Duggan arising out of his furnishing the gun. The prosecutor further agreed that after Duggan's trial testimony, he would join in an application to have Duggan's sentence reduced. Because by the time of trial Duggan had been paroled, he could not attain an earlier release from custody, but he did hope to have his parole supervision time reduced.
Duggan testified at trial for the State. As previously discussed, his testimony was critical with respect to defendant. Both defense counsel cross-examined him extensively regarding his October 7, 1997 statement and his agreement with the prosecutor. Counsel strongly attacked Duggan's credibility, suggesting his testimony should not be trusted because it was fabricated to enable him to avoid charges and get out of jail. Duggan was questioned about inconsistencies between the October 7, 1997 statement and his trial testimony (e.g., whether defendant was his cousin or family friend and whether or not he had given defendant any money).
After Duggan's testimony, the prosecutor called the investigator who took Duggan's October 7, 1997 statement. The investigator testified about the statement and, over defense objection, it was played for the jury.[2] It was ultimately admitted into evidence. The statement was admitted as a prior consistent statement, pursuant to N.J.R.E. 803(a), which provides:
The following statements are not excluded by the hearsay rule:
(a) Prior statements of witnesses. A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
....
(2) is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.
The State does not assert a charge of recent fabrication. It asserts a charge of improper influence or motive. It contends the defense clearly charged that Duggan's testimony was contrived to get his deal with the prosecutor. One of the defense attorneys referred in his opening to an anticipated State's witness, obviously Duggan, who allegedly passed the gun to the two defendants, "[b]ut yet, he's charged with nothing. He was basically told ... that he'd get help with one pending charge, and he wouldn't be charged in this crime.... [He is] walking free as long as he gives testimony here." From the outset of the trial, the defense attacked Duggan's credibility, suggesting he had a motive to lie (to get his deal) and his testimony was improperly influenced by the police (telling him what to say).
Defendant argues that implicit in N.J.R.E. 803(a)(2) is a temporal proximity requirement. On this theory, unless the prior statement was made before the occurrence of the asserted improper influence or motive, it lacks relevance to refute the charge. A majority of the United States Supreme Court adopted this rationale in interpreting Federal Rule of Evidence 801(d)(1)(B), the federal counterpart *85 to N.J.R.E. 803(a)(2). Tome v. United States, 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). Four justices favored a flexible case-by-case approach, in which the prior consistent statement's admissibility should turn on its relevance to rebut the charge of recent fabrication or improper influence or motive, whether the statement was made before or after occurrence of the motive or influence to lie arose. The dissenters recognized that "[i]n most cases, this approach will not yield a different result from a strict adherence to the premotive rule for, in most cases, postmotive statements will not be significantly probative." Id. at 175, 115 S.Ct. at 710, 130 L.Ed.2d at 594 (Breyer, J., dissenting). Ibid.
Our Supreme Court has declined to adopt as a rigid admissibility requirement that the prior statement was made prior to the motive or influence to lie. State v. Chew, 150 N.J. 30, 81, 695 A.2d 1301 (1997), cert. denied sub nom., Chew v. New Jersey, 528 U.S. 1052, ___, 120 S.Ct. 593, 145 L.Ed.2d 493 (1999). In Chew, a capital murder case, defendant challenged the trial court's admission into evidence of statements of two witnesses who inculpated him in the murder. In their initial contacts with the police, these witnesses had provided defendant with an alibi. Then, nine days later, they gave inculpatory statements. Their trial testimony was substantially consistent with the later statements. Their credibility was heavily attacked at trial.
The Court noted that the predecessor to N.J.R.E. 803(a)(2), Evid. R. 20, was interpreted "not to contain a temporal requirement `that a party seeking admission of a prior consistent statement show that the prior statement was made before any alleged motive to falsify existed on the part of the declarant.'" State v. Chew, supra, 150 N.J. at 79, 695 A.2d 1301, quoting State v. Johnson, 235 N.J.Super. 547, 556, 563 A.2d 851 (App.Div.), certif. denied, 118 N.J. 214, 570 A.2d 971 (1989). After noting the majority rationale in Tome for a contrary interpretation, the Court stated, "However, in this case, many things were happening as the different stories unfolded. There were shades of difference between the witnesses' motivations at different times." Id. at 80, 695 A.2d 1301. The Court further noted that "cross-examination tested whether the witnesses were further motivated by their plea agreements and whether the police had fed them with the details of their stories." Ibid. The Court concluded that in these circumstances "[t]he prior consistent statements had significant `probative force bearing on credibility beyond merely showing repetition.'" Id. at 81, 695 A.2d 1301 (quoting United States v. Pierre, 781 F.2d 329, 333 (2d Cir.1986)).
The Court in Chew found it unnecessary for its resolution of that case to determine whether N.J.R.E. 803(a)(2) contains the implicit temporal requirement of its counterpart federal rule. State v. Chew, supra, 150 N.J. at 81, 695 A.2d 1301. The Court requested that the "Committee on the Rules of Evidence review the current formulation of the Rule to determine whether any change need be made." Ibid. Five years and nine months have passed since Chew was decided, and no change has been made. The rule continues, by its explicit language, to contain no temporal requirement.
We are mindful of the Court's comment in a case decided after Chew that the scope of N.J.R.E. 803(a)(2) "encompasses prior consistent statements made by the witness before the alleged `improper influence or motive' to demonstrate that the witness did not change his or her story." Neno v. Clinton, 167 N.J. 573, 580, 772 A.2d 899 (2001). However, in that case, there was *86 no allegation of improper influence or motive on the witness' part, id. at 581, 772 A.2d 899, and the Court never mentioned Chew or Tome. In these circumstances, we do not view the comment to establish a temporal requirement.
There has been no clear determination, either by Rule amendment or case law, since Chew to impose a mandatory temporal requirement on N.J.R.E. 803(a)(2). For the reasons that follow, we view the circumstances of this case to be similar to those in Chew. Our Evidence Rules generally promote admissibility of all relevant evidence, N.J.R.E. 402, and "evince a more expansive approach to the admission of evidence." A.S. Goldstein Co. v. Bloomfield Plaza, 272 N.J.Super. 59, 66, 639 A.2d 347 (App.Div.), certif. denied, 137 N.J. 309, 645 A.2d 138 (1994). Trial judges are entrusted with broad discretion in making evidence rulings. We conclude that the purpose of N.J.R.E. 803(a)(2) is best advanced by not requiring a strict temporal requirement, but instead allowing trial judges to evaluate relevance under all of the circumstances in which the prior statement is proffered. In reaching this conclusion we recognize that whether the statement was made before the asserted motive or influence to fabricate is a substantial factor in determining relevance. It is not, however, absolutely controlling. Where there are no factors other than the alleged improper influence or motive influencing the prior statement or its making, a post-motive statement should ordinarily be excluded. Applying these principles in this case, we find no abuse of discretion in admitting Duggan's prior statement.
Duggan told the victim's father on the night of the murder that he had furnished the gun to defendant and Santiago. Testimony was elicited that Duggan spoke to investigators on two prior occasions over a three-month period before his October 7, 1997 statement, and that the information he then provided was consistent with that in his taped statement. Duggan was cross-examined forcefully about whether or not he included information in his earlier interviews contrary to his later taped statement. All of this was geared to demonstrating that he told the prosecutors what they wanted to hear in the taped statement, also implying the prosecutors fed him information. Of course, prior to October 7, 1997, there was no agreement between Duggan and the prosecutor. Further, at the time of trial, the consideration flowing to Duggan from the agreement had changed. He was already out on parole, although he still hoped to have the parole period reduced.
As in Chew, much was happening at the various times Duggan made statements and testified, and his motivations likely differed at different times. The defense used the taped statement to impeach Duggan by pointing out inconsistencies with his prior statements and his trial testimony. The statement was not irrelevant to rebut the charge that Duggan's testimony was the product of an improper influence or motive to lie. As in Chew, it related to differing motives to fabricate and was used for rehabilitative purposes. State v. Chew, supra, 150 N.J. at 81, 695 A.2d 1301. We are satisfied the statement had significant probative force pertaining to Duggan's credibility beyond mere repetition, see ibid., and was properly admitted under N.J.R.E. 803(a)(2).

IV
Defendant contends the trial judge improperly admitted evidence of the Howard robbery under N.J.R.E. 404(b) and, for the first time on appeal, contends the limiting instruction in conjunction with that evidence was erroneous. We reject both contentions. *87 With respect to the instruction, we note that defense counsel drafted it, and the court charged it without objection.
Admissibility of evidence of other-crimes or wrongs is guided by a four-prong test:
1. The evidence of the other crime must be admissible as relevant to material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.
[State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992) ]
Defendant's attack on the admission of this evidence focuses on the first and fourth prong. He argues that, although the Howard robbery had "some relevance" to the crimes charged, it was not necessary to the State's proofs, and its limited probative value is outweighed by its prejudicial effect. We do not agree. The probative value was very high. The evidence tends to establish that defendant and Santiago did indeed obtain the gun for the purpose of committing armed robberies, including that of one of their proposed victims, Rollins. No money was taken from Rollins; thus this evidence was very important in the State's proof of robbery and felony murder of Rollins, which were committed as part of the conspiracy to commit armed robberies.
The limiting instruction was given twice, once during the trial and in the final charge. It informed the jury that this evidence was "introduced only for a specific purpose, a narrow purpose, and that limited purpose is to assist the prosecution in establishing that the defendants had engaged in a conspiracy to commit robbery and what, if anything, was done in furtherance of that conspiracy." The jury was also informed the evidence could not be used for any other purpose, including the propensity to commit crimes.
We find no abuse of discretion in the judge's determination that this evidence was highly probative, see State v. Covell, 157 N.J. 554, 569, 725 A.2d 675 (1999) (absence of other evidence to prove some point enhances probative value), and its probative value is not outweighed by any prejudicial effect. State v. Marrero, 148 N.J. 469, 483, 691 A.2d 293 (1997). The limiting instruction was appropriate. As noted, it was drafted by the defense.
The trial judge alternatively admitted evidence of the Howard robbery as substantive evidence of the crimes charged, apart from N.J.R.E. 404(b). Because the charges included conspiracy to commit armed robbery, evidence relating directly to the commission of that crime is not other-crimes evidence. State v. L.P., 338 N.J.Super. 227, 235, 768 A.2d 795 (App.Div.), certif. denied, 170 N.J. 205, 785 A.2d 434 (2001); State v. Byard, 328 N.J.Super. 106, 113-14, 744 A.2d 1213 (2000); State v. Torres, 313 N.J.Super. 129, 160-61, 713 A.2d 1 (App.Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998); State v. Cherry, 289 N.J.Super. 503, 522, 674 A.2d 589 (App.Div.1995). The Howard robbery, at least to the extent of the charge of conspiracy to commit armed robbery, was part of the criminal event, or part of the res gestae of the crime. The evidence was properly admitted on this basis as well.
Affirmed.
NOTES
[1] The other playbacks were one excerpt of Howard, describing the robbery of him; one excerpt of McCoy, relating that Santiago came to him and stated he killed Rollins and that McCoy told him to throw the gun in the water; two excerpts of Joel Townsel, concerning his photo array identification of Santiago and the circumstances of his interaction with a defense investigator and Santiago's brother; and two excerpts of Brian Townsel, describing what the shooter was wearing and giving his eyewitness account of the shooting incident.
[2] The statement was redacted to remove extraneous material by agreement of all counsel.