**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4828-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LASHAWN FITCH,

    Defendant-Appellant.

_____

> Argued October 4, 2021 – Decided December 17, 2021
>
> Before Judges Sabatino, Rothstadt, and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 09-07-1467.
>
> Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).
>
> Monica Lucinda do Outeiro, Assistant Prosecutor, argued the cause for respondent (Lori Linskey, Acting Monmouth County Prosecutor, attorney; Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

In an earlier unpublished opinion, we affirmed defendant Lashawn D. Fitch's conviction and forty-year aggregate, No Early Release Act, N.J.S.A. 2C:43-7.2, sentence for having committed second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); first-degree robbery, N.J.S.A. 2C:15-1; and first-degree felony murder, N.J.S.A. 2C:11-3(a)(3). State v. Fitch, No. A-1014-14 (App. Div. Sept. 22, 2017) (slip op. at 48) (Fitch I).

Thereafter, defendant successfully pursued a petition for post-conviction relief based upon his claim that he received ineffective assistance of appellate counsel because defendant's attorney had simultaneously represented defendant and a co-defendant on appeal. As a result, and with the State's consent, defendant was permitted to file this new direct appeal. We now consider the matter anew.

On appeal, defendant raises the following contentions in a brief filed by counsel:

POINT I

THE CONVICTIONS MUST BE REVERSED BECAUSE DEFENDANT WAS DENIED HIS RIGHTS TO CONFRONTATION AND A FAIR TRIAL BY THE REPETITION OF HEARSAY IMPLICATIONS OF GUILT AND BLOSTERING OF EVERETT'S PRIOR STATEMENT.[1]  U.S. CONST., AMENDS. V, VI, AND XIV; N.J. CONST., ART. I, PARS. 1, 9, AND 10.  (NOT RAISED BELOW).

POINT II

THE CONVICTIONS SHOULD BE REVERSED BECAUSE DEFENDANT DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS RIGHT TO COUNSEL.  U.S. CONST. AMEND VI; N.J. CONST. ART. I, PAR. 10.  (NOT RAISED BELOW).

POINT III

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY A FAULTY ACCOMPLICE LIABILITY JURY CHARGE THAT FAILED TO PROPERLY INSTRUCT THE JURY THAT DEFENDANT COULD BE LIABLE FOR A LESSER OFFENSE THAN THE PRINCIPAL.  U.S. CONST. AMENDS. V. AND XIV; N.J. CONST. ART. I, PARS. 1, 9 AND 10.  (NOT RAISED BELOW).

POINT IV

THE FORTY-YEAR NERA SENTENCE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE FOR THIS SEVENTEEN-YEAR-OLD

---

[1]  Defendant's friend Ian Everett was a significant witness for the State.

A-4828-18

DEFENDANT; IT SHOULD BE REDUCED TO THE LOWEST LAWFUL TERM OF THIRTY YEARS.

In a supplemental brief filed by defendant directly, he raises these additional arguments that we have renumbered for clarity:

POINT [V]

THE PROSECUTION EXPOSED CRUCIAL HEARSAY EVIDENCE DURING THE TESTIMONY OF CAPTAIN DEANGELIS WHICH IMPLIED THAT DEFENDANT WORE AND DISCARDED THE BLACK HAT AND PURPLE GLOVES DURING A ESCAPE ROUTE. THIS INFORMATION WAS LEARNED THROUGH NON-TESTIFYING WITNESS.

POINT [VI]

THE ADMISSION OF OTHER CRIMES EVIDENCE WAS GROSSLY PREJUDICIAL AND DENIED DEFENDANT A FAIR TRIAL WHEN IAN EVERETT INFORMED THE JURY THAT PRIOR TO THE CONSPIRACY DEFENDANT FIRED A GUN FROM THE ROOF OF IAN EVERETT. (NOT RAISED BELOW).

SUB-POINT A.

THE [TRIAL] COURT ALSO FAILED TO GIVE A LIMITING INSTRUCTION ON THE PREJUDICIAL OTHER CRIMES EVIDENCE.

4

POINT [VII]

PROSECUTION['] S SELECTIVE PRESENTATION OF PORTIONS OF THE EVERETT VIDEO DURING SUMMATIONS DISTORTED THE EVIDENCE IN THE TRIAL. THUS VIOLATING DEFENDANT['] S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY. (NOT RAISED BELOW).

SUB-POINT A.

THE JURY REQUEST FOR PLAY BACK OF IAN EVERETTS RECORDING CONSTITUTED PLAIN ERROR WHEN [THE TRIAL COURT] FAILED TO GIVE THE JURY THE ENTIRE TESTIMONY INCLUDING HIS DIRECT AND CROSS EXAMINATION. THUS THE RECORDING WAS NOT PUT IN PROPER CONTEXT BEFORE THE JURY. (NOT RAISED BELOW).

POINT [VIII]

THE TRIAL COURT ERRED FOR NOT INSTRUCTING THE JURY ON THIRD DEGREE THEFT AS REQUESTED BY THE DEFENSE. THUS VIOLATING DEFENDANT['] S RIGHT TO A FAIR TRIAL. (PARTIALLY RAISED).[2]

We are unpersuaded by any of his contentions, and we affirm defendant's conviction and sentence because his arguments are unsupported by the record, the applicable law, or both.

---

[2] All but two of defendant's arguments—that his waiver of trial counsel was invalid and that the court erred by failing to charge theft as a lesser-included offense of armed robbery—were raised in his original appeal.

I.

The facts leading to defendant's arrest and conviction are well known to the parties and summarized in our earlier opinion. See Fitch I, slip op. at 5-11. We need not repeat them here.

II.

A.

We begin our review by addressing defendant's challenges to the admission of Everett's videotaped statement to police and the prosecutor's use of the tape during summations. As already noted, the trial court found Everett's videotaped interview, which contradicted his trial testimony, admissible under Gross,[3] after conducting the requisite hearing. The interview was approximately twenty minutes long and a redacted version was played to the jury during the testimony of Detective Daniel Baldwin of the Monmouth County Prosecutor's Office. Portions of the interview were also played during the prosecutor's summation and it was played in its entirety again during jury deliberations in response to a jury question.

Only after the jury resumed its deliberations, did defendant object to the tape's admission on hearsay grounds. Generally, defendant objected to the

---

[3] State v. Gross, 121 N.J. 1 (1990).

statements by detectives during their interview of Everett where they indicated to Everett that they heard Everett's story from other sources multiple times. In his brief, defendant specifically points to the following statement:

> DETECTIVE BALDWIN: All right. What did they say? Listen, I already know the story. Obviously you know I know the story, so --
>
> . . . .
>
> DETECTIVE BALDWIN: Yeah, no, the story -- the story is correct. I mean, the story adds up, corroborated with the -- the -- the other information we've learned from other people we've talked to, so I know you're being truthful with us. Just take your time and think about exactly what he said to you.
>
> . . . .
>
> DETECTIVE BALDWIN: I believe you. Did LaShawn tell you what happened, what he did with the gun afterwards?
>
> [Emphasis added.]

Defendant also takes issue in his brief with similar statements made by Baldwin and Detective Nelson of the Eatontown Police Department to Everett and his mother as follows:

> DETECTIVE BALDWIN: [Everett] witnessed things that led up to the homicide.

7

DETECTIVE NELSON:  And the information that he's given, we've heard it one, two, three times before, so it's just like --

DETECTIVE BALDWIN:  Just wanted him to be truthful with us and I'm glad, and I thank you for bringing him down.  I'm glad that you're being truthful with us.  We know -- we knew the story.

EVERETT:  I wish I told you earlier.

[Emphasis added.]

In objecting, defendant acknowledged that the detectives' statements were just a "tactic to try to get [Everett] . . . to say things," but he requested a curative instruction to ensure that the jury did not consider the statements for their truth. The trial court denied defendant's request for such a curative charge because Everett's videotaped interview was "something that's already been in evidence, already been dealt with, ruled upon, and redacted."

Defendant again raised this argument in his unsuccessful motion for a new trial.  Defendant acknowledged that he had an opportunity to review the videotape and the proposed redactions before it was presented to the jury, but that he did not "catch it" until the jury was already deliberating.  In response, the prosecutor argued that he made his redactions in good faith and attempted to keep prejudicial information from the jury.  As to the challenged remarks by the detectives, he explained that they were merely an "investigative technique":

8

"They're basically making him feel better, listen, we know it's -- it's true. We've heard it before. Feel comfortable that you're not the only one saying this."

B.

In Point I of his brief, defendant contends for the first time that he was denied his right to confrontation and a fair trial because of the admission and repetitive presentation of Everett's videotaped interview, which contained inadmissible hearsay, without providing the jury with a limiting instruction or other protective safeguards to minimize the potential prejudice.

According to defendant, the interviewing detectives' statements contained inadmissible hearsay prohibited by State v. Bankston, 63 N.J. 263 (1973). In Point VI, defendant contends that the prosecution's selective presentation of portions of Everett's videotaped out-of-court statement distorted the evidence in the trial and violated his right to a fair trial. He also contends that it was plain error for the trial court to not provide the jury with Everett's entire in-court direct and cross-examination testimony in response to the jury's request for a playback of Everett's videotaped interview statement.

At the outset, we observe that defendant did not make timely objection to the admission of the challenged statements even though he had an opportunity do so, and therefore his claims are reviewed for plain error. R. 2:10-2 (error "of

9

such a nature as to have been clearly capable of producing an unjust result.").

See also R. 1:7-2 (requiring objection "at the time the ruling or order is made or sought"); State v. Weston, 222 N.J. 277, 294 n.5 (2015); Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:7-2 (2021) (noting the need to provide the court with a basis of complaint to permit an opportunity to respond). Therefore, our review is limited to whether the detectives' remarks prejudiced a substantial right of defendant and were clearly capable of producing an unjust result. State v. Douglas, 204 N.J. Super. 265, 272-73 (App. Div. 1985).

Defendant's primary argument is that the detectives referenced statements by others who were not witnesses at his trial thereby violating his Confrontation Clause rights under the Sixth Amendment. That provision requires that, in a criminal prosecution, the accused has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right "is made obligatory on the States by the Fourteenth Amendment." Pointer v. Texas, 380 U.S. 400, 403 (1965). "A defendant's right to confront and effectively cross-examine the State's witnesses is essential to the due process right to a 'fair opportunity to defend against the State's accusations,' and is one of 'the minimum essentials of a fair trial.'" State v. Gilchrist, 381 N.J. Super. 138, 144 (App. Div. 2005) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)).

Under the Court's holding in Bankston, the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged. 63 N.J. at 268-69. To protect the defendant from the confrontation problems associated with such evidence, restrictions have been placed on Bankston-type testimony: An officer may explain the reason he approached a suspect or went to a crime scene by stating he did so "upon information received," id. at 268, but the officer may not become more specific by repeating details of the crime, or implying he received evidence of the defendant's guilt, as related by a non-testifying witness. State v. Luna, 193 N.J. 202, 216-17 (2007).

Later, in State v. Branch, 182 N.J. 338 (2005), where an officer testified he had included the defendant's photograph in an array "because he had developed defendant as a suspect 'based on information received,'" id. at 342, the Court determined the officer's testimony was inadmissible hearsay, engendering a jury that "was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime." Id. at 348. "Because the [informant] . . . was not called as a witness, the jury never learned the basis of [the informant's] knowledge regarding defendant's guilt,

whether he was a credible source, or whether he had a peculiar interest in the case." Ibid. The introduction of this "gratuitous hearsay testimony violated defendant's federal and state rights to confrontation as well as our rules of evidence." Ibid. The Court concluded by finding the violation sufficiently prejudicial, warranting reversal as plain error. Id. at 354.

"The principle distilled from Bankston and its progeny is that testimony relating inculpatory information supplied by a co-defendant or other non-testifying witness identifying the defendant as the perpetrator of a crime deprives the accused of his or her constitutional rights." State v. Farthing, 331 N.J. Super. 58, 75 (App. Div. 2000). See also State v. Taylor, 350 N.J. Super. 20, 34-35 (App. Div. 2002) (holding police officer's statements regarding various unidentified eyewitnesses' remarks about suspect inadmissible hearsay because offered to elicit accusations against the defendant by non-testifying witnesses); State v. Thomas, 168 N.J. Super. 10, 13-15 (App. Div. 1979) (reversing defendant's conviction where prosecutor elicited testimony from detective that led to "inescapable inference" that informant had given him the defendant's name).

Applying these guiding principles, we conclude that defendant's case is different, and Bankston did not apply. Here, the challenged statements came

12

from a videotaped recording that defendant had well before trial, and before its admission at trial, he had the opportunity to request redactions, review the proposed redactions, and afterward he accepted them before the tape was admitted into evidence and played to the jury. The hearsay rule does not apply to facts (in this instance, statements) agreed to by the parties. State v. Neal, 361 N.J. Super. 522, 534 (App. Div. 2003) (citing N.J.R.E. 101(a)(4)). Accordingly, the trial court properly rejected defendant's untimely hearsay challenge made long after the tape's admission into evidence. See State v. Lanzo, 44 N.J. 560, 566 (1965) (noting that "the defendant is in no position to urge prejudicial error" where he was afforded the opportunity and declined to propose redactions to an admissible statement). Defendant "acquiesced in the evidence." Newal. 361 N.J.S. at 534.

Furthermore, defendant's argument that the trial court erred by failing to provide a limiting instruction is not persuasive because the request was also not timely. "[A] criminal defendant [is] in a poor position to argue on appeal about the failure of the trial judge to give a curative instruction when he had not requested one when the error occurred." State v. Nelson, 318 N.J. Super. 242, 254 (App. Div. 1999). Here, the time to ask for an instruction was at the time the tape was admitted into evidence. As defendant did not raise or preserve his

confrontation claim prior to the jury viewing the recorded interview, he waived that claim. State v. Williams, 219 N.J. 89, 98 (2014).

Moreover, the State's case against defendant was strong, supported by substantial credible evidence. While hearsay is prejudicial to a defendant when the State's case is tenuous, "when a case is fortified by substantial credible evidence—for example, direct identification of the defendant—the testimony is not likely to be prejudicial under the 'plain error' rule." State v. Irving, 114 N.J. 427, 448 (1989) (citation omitted).

Here, even if the failure to give a limiting instruction was error, it was not plain error. The State's case was far from tenuous and almost everything discussed in the videotaped statement was corroborated by testimony and exhibits marked into evidence. For example, Michael Smith, the victim, Nathaniel Wiggins's friend, testified about how he and Wiggins drove by Everett's house and that Wiggins waived to Aron; and there was testimony from a law enforcement officer about the fight in Everett's neighborhood, the police responding, and juveniles fleeing area after the police arrived. Aron's cell phone records demonstrated that a call was made to Wiggins at 9:09 p.m. from the Neptune area; and the ballistics evidence supported the conclusion that Wiggins

was shot with a revolver, the same type of gun defendant possessed and shot from Everett's roof.

Further, Everett's account of defendant's admissions included defendant's identification of the co-defendants, Kenneth Michael Bacon-Vaughters ("Kenny Mike"), Tahj Pines, and Aron Pines, which was corroborated by the phone records and text messages exchanged by Aron, Tahj, and Kenny Mike. They also included defendant's description of what had occurred on the night of the homicide; specifically, that Aron stayed in the car, Kenny Mike knocked on Wiggins's door, and that "the dude [Wiggins] was trying to wrestle Kenny and something had happened." The last statement was corroborated by Wiggins's identification of the shooter as "Kenny Mike" to both Wiggins's girlfriend Faith Montanino, as recorded by the 9-1-1 operator, and by Wiggins's dying declarations to police.

Everett's statements were also corroborated by the physical evidence collected in the parking lot near the crime scene, which contained Tahj's DNA, and the hat discovered nearby containing defendant's DNA. However, we conclude again under the circumstances of defendant's trial, there was no error in the playing of the videotaped recording or the alleged failure to give a limiting

15

instruction to the jury based on the two detectives' fleeting reference to having heard Everett's account from other unidentified people.

C.

Next, we turn to defendant's contention that the trial court erred by permitting the replay of portions of Everett's videotaped interview during the prosecutor's summation without holding a Rule 104 hearing or issuing a limiting instruction as required by State v. Muhammad, 359 N.J. Super. 361 (App. Div. 2003). He also contends that the trial court erred by granting the jury's request for a playback of the videotape during deliberations without following the guidelines stated in State v. Burr, 195 N.J. 119 (2008).

At trial, prior to summations, defendant objected to the prosecutor's use of portions of the videotape during his summation on the ground that it was "inflammatory" and because it had "been shown to the jury already." Defendant did not request a Rule 104 hearing or a limiting instruction. The trial court overruled defendant's objection, ruling that the video could "be used as part of the closing arguments, just like any other evidence can be." Thereafter, the prosecutor replayed six portions of Everett's videotaped statement during his summation.

We consider the trial court allowing the prosecutor to use the videotape during summations under the harmless error, rather than the plain error, standard because defendant interposed a timely objection. Under that standard, there must be "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. R.B., 183 N.J. 308, 330 (2005) (alterations in original) (quoting Bankston, 63 N.J. at 273).

We apply the plain error standard under Rule 2:10-2, however, to defendant's contentions about the trial court not holding a hearing or failing to deliver a limiting instruction before the prosecutor replayed portions of the videotape because defendant did not request either. R. 2:10-2 (error "of such a nature as to have been clearly capable of producing an unjust result"). "Under that standard, defendant has the burden of proving that the error was clear and obvious and that it affected his substantial rights." State v. Morton, 155 N.J. 383, 421 (1998). The error claimed must be so egregious that it "raise[s] a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

As noted, defendant relies on Muhammad, 359 N.J. Super. at 361. In Muhammad, the trial was conducted in a courtroom equipped with videotape as the means of officially recording the proceedings. 359 N.J. Super. at 372. During summation, the prosecutor was permitted, over the defendant's objection, to play excerpts of the trial testimony of five State witnesses. Ibid. The defendant argued that this technique "might place undue emphasis on the portions played and might interfere with the ability of the jurors to rely on their own recollection of the witnesses' entire testimony." Ibid. The defendant claimed that it was error to allow the video playbacks at all and further argued, for the first time on appeal, that it was error not to have conducted a Rule 104 type hearing before allowing the playbacks and not to have given a cautionary instruction. Ibid. Specifically, the defendant argued that allowing the prosecutor to present the jury with a "repeat performance" of witness testimony during summation was "tantamount to allowing the State to call the witness a second time, giving undue emphasis to the testimony shown and, in effect, enabling the State to bolster its case by simple repetition." Id. at 378.

In our opinion, we declined the defendant's invitation to adopt a per se rule barring the use of this technique by the State in criminal cases. Ibid. Although recognizing "a significant potential for abuse," we concluded "that

18

whether or not to permit the technique, by either a prosecutor or defendant, should be determined on a case-by-case basis in the sound discretion of the trial judge."  Ibid.  We also explained that "[i]n their summations counsel may display . . . items of physical evidence that have been admitted[, including a]udio and videotaped statements of defendants and other witnesses."  Id. at 378-79.  We concluded it was not error to allow the playbacks, and, in the context of that case, that the failure to first conduct a Rule 104 type hearing and to later give a cautionary instruction did not constitute plain error.  Id. at 373.

However, acknowledging the potential pitfalls for the use of the technique, we set forth the following procedural safeguards that should be followed:  (1) an attorney who intends to use this technique should so inform the court and all other counsel at the earliest possible time, certainly before any party sums up; (2) a Rule 104 type hearing should be conducted to ensure the playback does not distort, misstate, or unduly emphasize the evidence; (3) trial judges have broad discretion in setting the permissible boundaries of summations; and (4) the trial judge should give a cautionary instruction at the time the video is played during summation and again in the final charge.  Id. at 378-82.

Nevertheless, although we found those safeguards were not followed in that case, we found no reversible error. We explained as follows:

> We have viewed the video excerpts and considered them in the context of the prosecutor's overall summation and in the context of the entire trial. Considering the length of the trial and the number of the witnesses, they were not unduly lengthy and did not overemphasize the State's case. They were not taken out of context and did not misstate or distort the testimony of the witnesses presented. They were used as an aid to the prosecutor in presenting her arguments, not as a running narrative that might tend to unfairly limit or obfuscate the trial issues. We find no abuse of discretion in allowing the playback of these limited excerpts.
>
> In the circumstances of this case we do not find plain error in the failure to conduct a hearing to view the excerpts before they were played or in the failure to give a cautionary instruction. Had a hearing been held, the result would have been the same, namely that the prosecutor would have been permitted to play the proffered excerpts. The judge's overall instructions adequately instructed the jury to consider all of the evidence as it is presented and the entire testimony of the witnesses in finding the facts in the case. We are satisfied the lack of a cautionary instruction in this case was not clearly capable of producing an unjust result. The lack of a cautionary instruction does not raise a reasonable doubt that the jury reached a result it might otherwise not have reached. Therefore, defendant's substantial rights were not affected.
>
> [Id. at 383-84.]

Here, like in Muhammad, defendant complained that the prosecutor did not give proper notice of his intent to use playbacks during his summation and the trial court neither a Rule 104 type hearing nor, sua sponte, gave a cautionary instruction to the jury. Defendant's argument is not persuasive. Everett's videotaped interview was previously played for the jury, and there was no claim that the portions played back during summation distorted or misrepresented Everett's statement. Further, as in Muhammad, the prosecutor's use of the playback excerpts "only constitute[d] an aid incidental to the argument of counsel," and was not "an end in itself." 359 N.J. Super. at 380.

Here, while no limiting instruction was provided to the jury, defendant did not request one. Further, during deliberations the jury had requested a playback of Everett's entire videotaped interview, the same video from which excerpts were played during the prosecutor's summation. Thus, just like in Muhammad, the playback of Everett's interview in its entirety "ameliorated any potential prejudice from the partial playbacks . . . during the prosecutor's summation and from the lack of a limiting instruction." Id. at 383. There was no error here.

As already noted, defendant also contends that the trial court erred by granting the jury's request for the playback of the Everett videotape during deliberations without following the guidelines set forth in Burr, 195 N.J. 119.

Once again, we apply the plain error standard because defendant did not object to the trial court's response to the jury's playback request. Again, we conclude there was no error, let alone plain error.

"[T]he response to a jury's request for a readback of testimony or a replay of a video recording is vested in the discretion of the trial judge." State v. A.R., 213 N.J. 542, 555-56 (2013). "Generally, once an exhibit has been admitted into evidence, the jury may access it during deliberations, subject to the court's instructions on its proper use." Burr, 195 N.J. at 133-34.

Videotaped testimony is distinctive, however, because "playing back recorded testimony reveals more than a sterile read-back does. A video playback enables jurors not only to recall specific testimony but also to assess a witness's credibility—which is precisely what jurors are asked to do." State v. Miller, 205 N.J. 109, 121 (2011). Videotaped testimony "is powerful evidence for the jury to see again, if it is not placed into context." Burr, 195 N.J. at 134. See also A.R., 213 N.J. at 546, 560 ("A video recording magnifies the effect of a playback of testimony." To avoid the dangers associated with video-recorded evidence, juries are not "permit[ed] unfettered access . . . to video-recorded statements of witnesses or a defendant during its deliberations.").

22                                                                    A-4828-18

In Burr, the Court summarized the appropriate considerations for the proper use of videotaped playbacks:  First, the jury should be asked if a readback of the statement would suffice.  195 N.J. at 135.  "If the jury persists in its request to view the videotape again, then the court must take into consideration fairness to the defendant."  Ibid.  Second, "[t]he court must determine whether the jury must also hear a readback of any direct and cross-examination testimony that the court concludes is necessary to provide the proper context for the video playback."  Ibid.  Third, the trial judge should deny the playback request if the defendant demonstrates that "consequential prejudice . . . from the playback could not be ameliorated through other means."  Ibid.  Fourth, the playback "must occur in open court."  Ibid.

Here, the jury requested a playback of Everett's videotaped interview, which was already admitted into evidence.  Defendant was provided the opportunity to object, but instead consented.  The playback occurred in open court.  However, the trial court did not inquire of the jury whether it would be satisfied with a readback of Everett's interview, nor did it decide on the record whether the jury should also hear a readback of any direct and cross-examination testimony that the court believed was necessary to provide the proper context

for the video playback. Notwithstanding those omissions, the playing of the videotaped interview was not plain error.

First, defendant did not object to the trial court's decision to have the videotape played to the jury rather than have the transcript of the interview read to it, although he was provided with the opportunity to do so. Second, defendant did not request a read-back of Everett's trial testimony (direct or cross) to put Everett's videotaped interview in proper context, if he believed that was necessary. However, and significantly, during his summation, defendant, who was self-represented, repeatedly referenced Everett's trial testimony, pointing out the inconsistencies between his videotaped interview and his trial testimony. Thus, the jury was aware of the inconsistencies between Everett's videotaped interview and his trial testimony when they requested a playback of the videotaped interview and, therefore, there was no need to put it into "context." See A.R., 213 N.J. at 562 (declining to find reversable error where the record demonstrated "that defense counsel utilized the video recording as part of her defense strategy by encouraging the jury to thoroughly consider the video recording in its deliberations").

Last, while the trial court did not provide a limiting instruction, as part of its final jury charge it instructed the jury to consider defendant's guilt "based on

24                                                                    A-4828-18

all the evidence presented during the trial" and that it was the jurors' "sworn duty to arrive at a just conclusion after considering all of the evidence which was presented during the course of the trial."  The jury is presumed to have understood and followed those instructions, State v. Feaster, 156 N.J. 1, 65 (1998), which cautioned the jury against considering the videotaped interview to the exclusion of the other evidence produced at trial or overemphasizing any one piece of evidence.  See also State v. T.J.M., 220 N.J. 220, 237 (2015) (appellate courts "act on the belief and expectation that jurors will follow the instructions given them by the court").  Under these circumstances, we again can find no error.

## III.

The next argument we consider, also raised for the first time on appeal, is defendant's contention that his conviction should be reversed because he did not knowingly and intelligently waive his right to trial counsel.  Before his trial commenced, defendant initially requested permission to act as co-counsel, and shortly thereafter, asked for permission to proceed pro se.  In response to defendant's motion, the court held a Faretta[4] hearing to ensure defendant's

---

[4]  Faretta v. California, 422 U.S. 806 (1975).

waiver of counsel was knowing and voluntary.  As defendant concedes on appeal, at the hearing the trial court advised him "of a large number of the concerns addressed by Crisafi."[5]  Specifically, defendant acknowledges that during the Faretta hearing, the court asked him

> why he wanted to represent himself, whether he knew what the charges were, whether he had reviewed the discovery, whether he knew the law on the substantive offenses, his level of education, his sentence exposure, the difficulty of separating his role as an attorney from that of a defendant, how he would handle his own testimony if he chose to testify, that he would be waiving claims of ineffective assistance of trial counsel, if he knew how he would handle examination of his expert witness, if he knew how to pick a jury, that he would have to act professionally in court, and that he would have to conduct all of the witness examinations and the opening statement and closing argument.

However, defendant argues that "[t]he trial court failed in its obligation to ensure that [he] actually understood what he was doing when he waived his right

---

[5]  State v. Crisafi, 128 N.J. 499 (1992).  In Crisafi, the Court held that trial courts must inform defendants of "the nature of the charges against them, the statutory defenses to those charges, and the possible range of punishment."  Id. at 511. Courts should also appraise defendants of "the technical problems they may encounter in acting as their own counsel and of the risks they take if their defense is unsuccessful."  Id. at 511-12.  Defendants should be notified that they must conduct their defenses in accordance with the relevant rules of procedure and evidence, that "a lack of knowledge of law may impair their ability to defend themselves," and that in general it may be unwise not to accept counsel's assistance.  Id. at 512.

to counsel" by "check[ing] to see if [his] conception of the law was actually correct." According to defendant, "the court's questions elicited answers showing that defendant believed he knew what he was doing, but they were not questions that would probe the verity of that belief."

Further, according to defendant, the court did not "make sure that he knew fundamental concepts like the elements of the charged offenses, potential lesser included offenses, and any possible defenses to the charges." Last, defendant argues that the trial court's voir dire of defendant was deficient and his finding that defendant's waiver was knowing and intelligent was improper because he "made no finding whatsoever with respect to defendant's young age or mental illness."

We begin by observing that a trial court is "in the best position to evaluate defendant's understanding of what it meant to represent himself and whether defendant's decision to proceed pro se was knowing and intelligent." State v. DuBois, 189 N.J. 454, 475 (2007). For that reason, a trial court's determination of whether a defendant "knowingly and intelligently waived his right to counsel" is reviewed for abuse of discretion. Ibid.

It is now beyond cavil that "a defendant has a constitutionally protected right to represent himself in a criminal trial." Faretta, 422 U.S. at 816. See also

State v. Outland, 245 N.J. 494, 505 (2021) ("The corollary to the right of a criminal defendant to be represented by an attorney is the defendant's right to represent himself." (quoting State v. King, 210 N.J. 2, 16 (2012))).

Because a waiver of the right to counsel constitutes a relinquishment of "many of the traditional benefits associated with" that right, it must be made "knowingly and intelligently." Faretta, 422 U.S at 835. "Courts will indulge every reasonable presumption against the waiver of fundamental constitutional rights and will not presume their loss by acquiescence." State v. Guerin, 208 N.J. Super. 527, 533 (App. Div. 1986). "[R]elinquishing one's right to the benefits of representation by counsel can be allowed only when the court is satisfied that the defendant understands 'the implications of the waiver [of counsel].'" Outland, 245 N.J. at 505 (alteration in original) (quoting Crisafi, 128 N.J. at 511).

When a criminal defendant requests to proceed self-represented, the trial court must (1) "engage in a searching inquiry" to determine whether the defendant understands the implications of the waiver, (2) assure itself that a waiver of counsel is made "knowingly and intelligently," and (3) confirm the waiver on the record. Crisafi, 128 N.J. at 509-10. It need not determine whether a defendant is familiar with "technical legal knowledge," but rather whether he

28

or she "understands the nature and consequence" of the waiver.  State v. Reddish, 181 N.J. 553, 594-95 (2004).  See also Outland, 245 N.J. at 509.  If the court's inquiry reveals the requisite understanding, then "the defendant must be allowed to exercise his constitutional right to self-representation."  State v. Figueroa, 186 N.J. 589, 593 (2006).

However, the right of self-representation is "not absolute" and "cannot be used to jeopardize the State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts."  King, 210 N.J. at 18. That said, the risks associated with defending oneself are not a basis for denying a defendant the right to choose self-representation.  Id. at 17.  Indeed, a court should not focus on "whether a pro se defendant will fare well or badly," but it must "ensure that he knows and understands that, by his choice, he may not do well."  Reddish, 181 N.J. at 592.

"The trial court must explore fully the bona fides of a defendant's claim of 'knowingness.'  It must determine whether a defendant's 'understanding' is real or feigned."  Reddish, 181 N.J. at 594.  Open-ended questions are essential to afford the defendant the opportunity to "describe in his own words his understanding of the challenges that he will face when he represents himself." Id. at 595.  The trial court "must advise defendant that if the court allows him to

represent himself, he will thereby waive any and all later claims that his self-representation constituted ineffective assistance of counsel." Id. at 594.

In Outland, our Supreme Court recently rejected the very contention that defendant is advancing before us. 245 N.J. at 497. In that case, the Court reversed our decision affirming the trial court's decision to not allow the defendant to proceed self-represented and remanded for a new trial "[b]ecause the trial court quizzed defendant on his knowledge of substantive law rather than provide the information required by our case law to confirm he was making a knowing and voluntary waiver of counsel." Ibid. In doing so, the Court explained the following:

> As the United States Supreme Court made clear in Faretta, the purpose of the inquiry is not to test a defendant's technical legal expertise, but to ensure that he makes his decision to waive counsel "with eyes open." Here, the court's questions were geared toward ascertaining whether defendant was fit to practice law, not whether he understood the perils of self-representation. To be sure, a knowing and intelligent waiver under Faretta, Crisafi, and Reddish does not suggest that a defendant must have the "knowledge" and "intelligence" of a law school graduate. Rather, a knowing and intelligent waiver must reflect that the defendant has an understanding of the risks and consequences of representing himself after he has been fully apprised -- by the court -- of those risks and consequences, as well as of certain fundamental information about the offenses charged.

30

As noted above, the <u>Crisafi</u>/<u>Reddish</u> inquiry requires trial courts to inform defendants of the nature of the charges, statutory defenses, and the range of punishment. <u>DuBois</u>, 189 N.J. at 468-69. . . .

The colloquy here was a textbook example of testing defendant's technical legal knowledge as opposed to determining whether he was knowingly and intelligently waiving his right to counsel. Although the trial court followed the format of the <u>Crisafi</u>/<u>Reddish</u> inquiry by covering the topics required, the court erred in quizzing defendant on those areas and not providing him the substantive information regarding the nature of his charges and applicable defenses. . . .

In sum, the colloquy should have "test[ed] the defendant's understanding of the implications of the waiver," not his understanding of substantive law. . . .

[<u>Id.</u> at 507-09 (third alteration in original).]

"Caselaw makes clear that the goal of the colloquy is not to ascertain whether a defendant possesses technical legal knowledge." <u>Id.</u> at 506. Rather, it requires that the trial court inform a defendant asserting the right to self-representation of:

(1) the nature of the charges, statutory defenses, and possible range of punishment; (2) the technical problems associated with self-representation and the risks if the defense is unsuccessful; (3) the necessity that defendant comply with the rules of criminal procedure and the rules of evidence; (4) the fact that the lack of knowledge of the law may impair defendant's ability to defend himself or herself; (5) the impact that the dual role of counsel and defendant may have; (6) the reality that it would be unwise not to accept the

31

assistance of counsel; (7) the need for an open-ended discussion so that the defendant may express an understanding in his or her own words; (8) the fact that, if defendant proceeds pro se, he or she will be unable to assert an ineffective assistance of counsel claim; and (9) the ramifications that self-representation will have on the right to remain silent and the privilege against self-incrimination.

[DuBois, 189 N.J. at 468-69.]

Contrary to defendant's contention, the trial court here was not required to determine whether defendant was familiar with "technical legal knowledge" but rather whether he "underst[ood] the nature and consequences of his waiver." Reddish, 181 N.J. at 594-95. See also King, 210 N.J. at 19 (finding court need not explore a defendant's familiarity with "technical legal knowledge," "for that is not required"). Rather, the focus must be on great risks a defendant faces if he loses at trial while being self-represented. Id. at 21.

Also, the fact that the trial court here did not, as defendant now contends before us, discuss the statutory defenses with him is of no moment because the record reveals that defendant was aware of those defenses. Where a record amply demonstrates that defendant was well aware of available defenses, the claim that the court did not review them with defendant is not a reason to vacate a conviction. State v. Ortisi, 308 N.J. Super. 573, 589-90 (App. Div. 1998). Allowing a defendant to proceed without reviewing his available defenses is

32

especially appropriate where a defendant's "history and familiarity with the legal system, his admitted and demonstrated knowledge throughout the pretrial proceedings, his responses to the various warnings given to him about the dangers and pitfalls of representing himself," establishes his knowledge of his defenses. Id. at 590.

Here, the record amply demonstrates that defendant was well aware of his defenses. Defendant was the last of the four co-defendants to be tried on the indictment, and he was aware of the outcomes of the other trials. Indeed, defendant was aware that Aron was acquitted on certain charges of the indictment, and defendant advised his former trial counsel that he believed that the "facts associating [Aron] with this crime far exceed[ed] any facts the State has against [defendant]." Moreover, defendant had "the complete transcript of the trial proceedings for some of the co-defendants in this indictment ([Kenny Mike])."

Also, defendant explained to the trial court's satisfaction that his disagreements with his former trial counsel led to his desire to proceed pro se. When asked why he wanted to proceed pro se, defendant explained:

> I just feel that over the course I've been here five plus years, I feel that I've been diligently working and I've perfected -- well, not perfected. I've gotten as close to, I feel, as perfection as my defense in this case. And

like [trial counsel] said, like things he shared and things that I've shared, like we couldn't really come to agreement, a positive agreement. And if it comes to the day if the jury[ is] in the room, I don't want them to see conflict going between me and [trial counsel] as the -- it looks like we're not even on the same page. And I feel that with me, because there's nobody that could tell the story better but the accused, I feel. So I feel that I'm the one for the task that can give this case everything that it needs to move forward with the result that I'm looking for.

Moreover, trial counsel supported defendant's application, explaining to the court:

I have spoken to [defendant] about the pitfalls of self-representation and at length about the consequences if convicted of these charges. I have made every appropriate pre-trial application in his defense; however, [defendant] argues that since he has been living with the concept of his defense and these charges every day for the past five years, he is better equipped to present his case to the jury. His confidence is emboldened by the roadmap presented in the previous trial proceedings of his co-defendants.

In addition, defendant had the benefit of stand-by counsel for the remainder of the proceedings.

Finally, there is no merit to defendant's argument that in allowing him to proceed as a self-represented defendant, the trial court failed to consider that he was twenty-three years old at the time of trial and, "as noted in the pre-sentence report, [he] had a significant history of mental illness." Here, the trial court

questioned defendant about his age, literacy, and his education; the court was aware that defendant was twenty-three years old at the time of trial, could read English, had graduated from Neptune High School, and had attended some college. It also asked defendant if he was under the influence of any medication or other substance that would prevent him from understanding the nature of the proceeding when he sought to act as co-counsel and when he sought to waive counsel and proceed pro se, and both times defendant responded "no." The court even asked defendant if he had spoken to his parents about his decision to represent himself, and he responded that he had "given them the full details of my wishes" and that they were supporting his application.

Regarding defendant's mental capacity to make a knowing and voluntary waiver of counsel, there was nothing in the record before the trial court that would even suggest that defendant did not have the capacity to make such a waiver or that he suffered from any mental illness. Neither defendant nor his counsel raised the issue with the court. Further, defendant's parents neither advised the court that defendant lacked the mental capacity to represent himself nor otherwise opposed his application and, in fact, they supported it.[6]

---

[6] The only evidence that defendant cites to support his claim that he "had a significant history of mental illness" is the presentence report, a document that

The court's colloquies with defendant about the possibility of his acting as co-counsel and later about representing himself, coupled with trial counsel's support of defendant's applications and the lack of objection or opposition of defendant's parents, sufficiently demonstrated that defendant was aware of the charges against him and potential defenses and that he understood the magnitude of the charges as well as the possible consequences of conviction, and, therefore, the consequences of his waiver. See Crisafi, 128 N.J. at 512 (The "ultimate focus must be on the defendant's actual understanding of the waiver of counsel."). Because nothing in the record before the trial court supports defendant's claim that his "mental illness" prevented him from making a knowing and intelligent waiver of counsel, it was required to allow defendant "to exercise his constitutional right to self-representation." Figueroa, 186 N.J. at 593.

---

did not even exist at the time of the Faretta hearing. The presentence report revealed that in 2004 defendant had received psychological treatment/counseling and had been diagnosed with oppositional defiant disorder; in 2009 he was diagnosed with bipolar disorder; and in 2012 he was diagnosed with depression disorder not otherwise specified. He received "psychotropic drugs Remeron, Lithium, Vistaril, and Trazodone." However, the presentence report specified that defendant stated that his then-current overall physical and mental health were "good."

IV.

In Point V, defendant raises another Confrontation Clause argument. There he contends that he was denied a fair trial when the prosecutor elicited improper hearsay testimony from Detective DeAngelis about a possible escape route, and that that information was provided to DeAngelis from a non-testifying witness, violating his right to confrontation and a fair trial, despite a limiting instruction given to the jury by the trial court.

During the direct examination of DeAngelis, the prosecutor asked the detective about the discovery of the black knit hat with eye holes cut out and purple gloves, which were sent to the lab for testing more than two years after the homicide. The prosecutor asked whether it was "fair to say a decision was made to send those items [to the lab for testing] . . . based on the investigation at the time." However, on cross-examination, re-cross, and re-re-cross, defendant continued asking DeAngelis about the two-year delay in sending those items to the lab for testing, suggesting that those items might not have been related to the homicide or that the police investigation was deficient.

In response to defendant's repeated questioning about the two-year delay, the prosecutor asked on re-re-re-direct to first confirm that during the interim, "[m]ore information was learned in the investigation," and then whether that

information related to "a route of exit." At that point, defendant objected, and the court overruled, stating that if the witness had independent knowledge about that area of inquiry, he could answer the question. After the prosecutor restated the question, DeAngelis began to answer that the information was obtained from "Major Crimes detectives involved in this investigation." Defendant objected again and after a sidebar conference, the court sustained the objection, instructing the jury to "disregard the last answer from" the witness.

In his later motion for a new trial, defendant raised this issue, arguing that the prosecutor's questioning of DeAngelis about the two-year delay in sending evidence to the laboratory for testing was prosecutorial misconduct. The trial court denied the motion, concluding that the prosecutor's question was not misconduct because the prosecutor was just responding in good faith to defendant's cross-examination, defendant was not prejudiced because his objection was sustained, DeAngelis's answer was struck, and the jury was instructed to disregard it. Furthermore, defendant was not prejudiced by the questioning because there was other evidence in the case of the potential escape route.

Against this backdrop, we conclude defendant's arguments on appeal about DeAngelis' challenged testimony are without sufficient merit to warrant

38

discussion in a written opinion, R. 2:11-3(e)(2), and we affirm, substantially for the reasons expressed by the trial court.

V.

In Point VI, defendant contends that the admission of other-wrongs or bad-acts evidence was "grossly prejudicial" and denied him a fair trial. Specifically, defendant points to Everett's videotaped interview wherein he testified that, prior to Wiggins's shooting, defendant fired a gun from the roof of Everett's house, which was the same gun that had been recovered from Everett's backyard earlier that day. Defendant contends that the admission of Everett's testimony violated N.J.R.E. 404(b) and N.J.R.E. 403. He argues that that evidence was not intrinsic because "the act of shooting the [alleged murder] weapon did not directly prove" the charged crimes or that he conspired with co-defendants. Alternatively, he argues that even if that evidence was intrinsic, the evidence should have been excluded because it failed the N.J.R.E. 403 balancing test as its prejudice clearly outweighed its probative value. Finally, he argues that the court erred by admitting such evidence without providing a limiting instruction.

We begin noting again that here too defendant did not object to the complained of testimony. Therefore, his argument is reviewed for plain error.

A-4828-18

R. 2:10-2.  Applying that standard, we find no merit to these contentions because the challenged evidence was intrinsic, and its probative value was not substantially outweighed by the potential prejudice to defendant.

To be admissible at trial, evidence "must be relevant—that is, it must have 'a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'"  State v. Sanchez-Medina, 231 N.J. 452, 462 (2018) (quoting N.J.R.E. 401).  In making a determination about relevancy, the court's "inquiry focuses on 'the logical connection between the proffered evidence and a fact in issue,'" and "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar."  State v. Buckley, 216 N.J. 249, 261 (2013) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 15 (2004)).  The court should ask "whether the thing sought to be established is more logical with the evidence than without it."  Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)).

Other-wrongs or bad-acts evidence can at times be highly prejudicial, State v. Vallejo, 198 N.J. 122, 133 (2009), and the inherent dangers of the admission of such evidence is that "a jury may convict a defendant not for the offense charged, but for the extrinsic offense."  State v. Garrison, 228 N.J. 182, 193-94 (2017).  Indeed, "the inherently prejudicial nature of [other-crimes]

evidence casts doubt on a jury's ability to follow even the most precise limiting instruction." State v. Stevens, 115 N.J. 289, 302, 309 (1989).

N.J.R.E. 404(b) provides:[7]

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

However, the Rule does not exclude evidence of other crimes, wrongs, or acts under all circumstances. State v. Nance, 148 N.J. 376, 386 (1997). "Such evidence is inadmissible only if offered to prove a disposition to commit crime or wrong or a specific type of act as a basis for an inference that an individual committed a crime or wrong or act at some relevant time." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 404 (2020-21). "N.J.R.E. 404(b) explicitly makes such evidence admissible to prove some other fact in issue." Ibid.

---

[7] The quote is from the Rule as it existed at the time of trial in this case.

A-4828-18

In State v. Cofield, 127 N.J. 328, 338 (1992), our Supreme Court established a four-prong test to determine the admissibility of other-crimes evidence under N.J.R.E. 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

Whenever other-wrongs or bad-acts evidence is sought to be admitted, the trial court must make a threshold determination "whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under [N.J.R.E.] 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly [N.J.R.E.] 403." State v. Rose, 206 N.J. 141, 179 (2011). See also State v. Sheppard, 437 N.J. Super. 171, 193 (App. Div. 2014) (holding that if the evidence is intrinsic, "N.J.R.E. 404(b) does not apply because the evidence does not involve some

other crime, but instead pertains to the charged crime"). The <u>Rose</u> Court explained,

> [C]haracterization of evidence as "intrinsic" significantly affects the calculus because the principle animating [N.J.R.E.] 403 is that relevant evidence is admissible unless its probative value is substantially outweighed by a negative feature of the evidence, whereas [N.J.R.E.] 404(b) operates from the premise that evidence of other bad acts is inadmissible unless proffered for a proper purpose. It is therefore more likely that evidence of uncharged misconduct will be admitted into evidence if it is considered intrinsic to the charged crime and subject only to [N.J.R.E.] 403 than if it is not considered intrinsic evidence and subject to both [N.J.R.E.] 404(b) and [N.J.R.E.] 403.
>
> [<u>Rose</u>, 206 N.J. at 178.]

The term "intrinsic" is not easy to define with precision. <u>Ibid.</u> To determine what is intrinsic, in <u>Rose</u> the Court adopted the test in <u>United States v. Green</u>, 617 F.3d 233, 248-49 (3d Cir. 2010), holding that evidence is considered intrinsic if it "directly proves" the crime charged or if the other wrongs or bad acts in question were performed contemporaneously with, and facilitated, the commission of the charged crime. <u>Rose</u>, 206 N.J. at 180 (quoting <u>Green</u>, 617 F.3d at 248-49).

Contrary to defendant's appellate contentions, the evidence that he had possession of and fired a gun hours before the homicide is intrinsic, as it directly

proved the charged crimes or, at the very least, his act of firing the gun was performed contemporaneously with, and helped facilitate, the commission of the charged crimes. Rose, 206 N.J. at 180. According to Everett's videotaped interview, a gun was left in his backyard, which was retrieved by defendant, and later that day (the same day of the shooting) defendant shot it from Everett's roof. Shortly after defendant had fired the gun, Aron said something like "I got the gun and shit," and began talking to defendant about robbing the "weed man." The morning after the shooting, defendant went to Everett's house and told him that "they got rid of the gun."

Everett described the gun as a revolver or "shell catcher," which was consistent with DeAngelis's testimony that the bullet recovered during the autopsy could have been fired from a revolver and, because no bullet casing(s) was (were) found at the crime scene, supports the conclusion that the murder weapon was a revolver.

Here, the evidence supported the conclusion that defendant possessed the gun and discharged it mere hours before the robbery and homicide and that it was the same gun used by his co-conspirators to commit those crimes, and also supports the inference that defendant contributed that gun to promote the conspiracy to rob the "weed man." Therefore, the evidence that defendant

44

possessed and fired the gun just prior to the robbery and homicide was admissible as intrinsic evidence because it directly proved he was part of the conspiracy; at the very least, his possession and firing of the gun was contemporaneous with, and helped facilitate, the commission of the charged crimes. Rose, 206 N.J. at 180. Therefore, that evidence was "exempt from the strictures of [N.J.R.E.] 404(b)" and did not require a limiting instruction. See id. at 177-78. See also State v. Cherry, 289 N.J. Super. 503, 522 (App. Div. 1995) (When the "other crimes" evidence is part of the total criminal conduct that occurred during the incident in question, "the requirement that a limiting instruction be given when 'other crimes' evidence is used is inapplicable."); State v. Martini, 131 N.J. 176, 242 (1993) (no limiting instruction required where uncharged wrong or bad act related "directly to the crime for which defendant was then standing trial"), overruled on other grounds, State v. Fortin, 178 N.J. 540, 638-39, 646 (2004).

Nevertheless, even if this evidence was considered other-wrongs or bad-acts evidence under N.J.R.E. 404(b), its admission was not plain error. Our courts have allowed the admission of evidence of a defendant's prior possession of a gun under similar circumstances. See, e.g., State v. Whitehead, 80 N.J. 343, 347 (1979) (upholding admission of evidence in a murder trial that, three hours

before shooting, defendant committed robberies with a gun similar to the gun used to kill victim); Muhammad, 359 N.J. Super. at 389-90 (approving admission of evidence in robbery/felony-murder trial that defendants acquired a gun two days prior for purpose of committing robberies and used it to commit a prior robbery, in order to prove they engaged in conspiracy and acts in furtherance); State v. Hardaway, 269 N.J. Super. 627, 629 (App. Div. 1994) (Defendant's "possession of the handgun within three weeks of the shooting is evidence of [defendant's] presence at the shooting and therefore such evidence is admissible under Rule 55 [now N.J.R.E. 404(b)]."); and State v. Gillispie, 208 N.J. 59, 86 (2011) (finding that where the same gun is used in a prior crime and subsequent crime, defendant's involvement in a prior crime is "relevant evidence in linking defendant[]" to the subsequent crime).

Moreover, that evidence would not have been excluded under the fourth Cofield prong or N.J.R.E. 403 because defendant's possession and use of a gun, shortly before talking about robbing the "weed man" and mere hours before the robbery and homicide, was highly probative evidence of defendant's involvement in the conspiracy and participation in those crimes. While such evidence was prejudicial to defendant, the probative value was great and was

46

not substantially outweighed by the potential prejudice to defendant.  N.J.R.E. 403.

## VI.

In Point VIII, defendant contends that the court erred by declining to charge third-degree theft as a lesser-included offense of armed robbery because there was a rational basis to give the requested charge.  He argues that he "was never given the opportunity to effectively argue a rational basis for warranting a[n] instruction for theft," because the trial court "summarily rejected the argument altogether."  According to defendant, had the court instructed the jury on third-degree theft, "he would not have been convicted of first-degree robbery felony murder."

At the charge conference, defendant's former trial counsel, who was by then stand-by counsel, inquired about the possibility of charging the lesser-included offense of theft.  The trial court responded by stating it would not give that charge because only the "lesser included charge of second-degree robbery" applied under the circumstances presented, despite counsel's argument that the issue of defendant's culpability could under the evidence be resolved by the jury finding he only conspired to commit a theft, even though a weapon was present and used in the robbery.

A-4828-18

We consider defendant's challenge to the trial court's ruling fully aware that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). Jury instructions must explain in comprehensive terms the relevant law applicable to the facts to be determined. Id. at 287-88. Thus, erroneous instructions on material issues are presumed to constitute reversible error. State v. Collier, 90 N.J. 117, 122-23 (1982); State v. Cook, 300 N.J. Super. 476, 489 (App. Div. 1996).

Whether to charge a lesser included offense is governed by N.J.S.A. 2C:1-8(d)(1), which requires those offenses to "be established by proof of the same or less than all the 'facts,' not 'elements,' required to establish the commission of the offense charged." State v. Graham, 223 N.J. Super. 571, 576 (App. Div. 1988). N.J.S.A. 2C:1-8(e) provides that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." "When a defendant requests a lesser-included-offense charge, 'the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied.'" State v. Alexander, 233 N.J. 132, 142 (2018) (quoting State v. Crisantos, 102 N.J. 265, 278 (1986)).

The evidence must present a rational basis on which the jury could acquit the defendant on the greater charge and convict on the lesser. State v. Carrero, 229 N.J. 118, 128 (2017); State v. Brent, 137 N.J. 107, 117, 118-19 (1994). "If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error." Carrero, 229 N.J. at 128 (citing Brent, 137 N.J. at 118).

The court is required to charge the jury with all offenses "clearly indicated in the record." State v. Garron, 177 N.J. 147, 179-80 (2003). "The rational-basis test sets a low threshold" for a lesser-included-offense instruction. Carrero, 229 N.J. at 128. "A defendant is entitled to an instruction on a lesser offense supported by the evidence regardless of whether that charge is consistent with the theory of the defendant's defense." Brent, 137 N.J. at 118 (citation omitted). "However, sheer speculation does not constitute a rational basis." Ibid. "In deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." Carrero, 229 N.J. at 128 (citation omitted).

Theft is a lesser-included offense of robbery. A theft occurs when a person "unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." N.J.S.A. 2C:20-3(a). A

robbery is essentially an aggravated theft.[8]  N.J.S.A. 2C:15-1(a).  It is appropriate to charge theft if "there is a question whether the defendant's act of 'inflict[ing] bodily injury,' 'us[ing] force upon another' or 'threat[ening] another with [or] purposefully put[ting] him in fear of bodily injury' occurred 'in the course of committing a theft.'"  State v. Harris, 357 N.J. Super. 532, 539 (App. Div. 2003) (alterations in original).

---

[8]  N.J.S.A. 2C:15-1 provides:

> a. Robbery defined. A person is guilty of robbery if, in the course of committing a theft, he:
>
> (1) Inflicts bodily injury or uses force upon another; or
>
> (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
>
> (3) Commits or threatens immediately to commit any crime of the first or second-degree.
>
> An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.
>
> b. Grading.  Robbery is a crime of the second-degree, except that it is a crime of the first-degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

Here, there was no rational basis to charge theft as a lesser-included offense because there was no question that the co-defendants took the gun to Wiggins's home and fatally shot him "in the course of committing a theft." N.J.S.A. 2C:15-1; Harris, 357 N.J. Super. at 539. The evidence demonstrated that defendant and the co-defendants went to Wiggins's apartment, armed, with the intent to rob Wiggins, and that Wiggins was fatally shot during the robbery. Thus, the evidence did not present a rational basis on which the jury could have acquitted defendant on the greater charge of second-degree robbery but convicted him on the lesser-included charge of theft, Carrero, 229 N.J. at 128, especially whereas here defendant pursued an alibi defense based on his assertion that he was not with co-defendants when Wiggins was shot but instead was home babysitting. See State v. Maloney, 216 N.J. 91, 110 (2013) (finding no rational basis to charge lesser-included offense of theft on robbery charge where State presented evidence that defendant was part of a four-person conspiracy to commit armed robbery resulting in the shooting of victim, and defendant denied participation in conspiracy and robbery).

Also, neither the trial evidence nor defendant's arguments demonstrate a rational basis to conclude that the use of the gun was temporally distant or separate from the commission of the theft, i.e., that the use of the gun was a

51

"separate offense," State v. Grissom, 347 N.J. Super. 469, 479 (App. Div. 2002), or "discrete event[]." Harris, 357 N.J. Super. at 540-41. Further, there was no evidence to support the conclusion that defendant's intent was to steal from Wiggins without the threat or use of force. See State v. Cassady, 198 N.J. 165, 178-79 (2009) (declining to charge theft as lesser-included offense of robbery; court would not speculate about defendant's subjective intent where objective evidence clearly demonstrated intent to commit robbery). Simply put, there was no rational basis to charge theft as a lesser-included offense of robbery.

## VII.

In Point III, defendant contends for the first time on appeal that he was denied his right to due process and a fair trial because the court provided a faulty accomplice liability jury charge that failed to properly instruct the jury that he could be liable for a lesser offense than the principal. He argues that the trial court should have given a Bielkiewicz[9] charge. According to defendant, the absence of such a charge created a "very real risk that the jury believed that because the principal (presumably Kenny Mike) intended to commit an armed robbery, defendant must have, too."

---

[9] State v. Bielkiewicz, 267 N.J. Super. 520 (App. Div. 1993).

The accomplice liability charge read to the jury provided, in relevant part:

A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of an offense. A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he, A, solicits such other persons to commit it and/or B, aids or agrees or attempts to aid such other persons in planning or committing it. This provision of the law means that not only is the person who actually commits the criminal act responsible for it, but one who is legally accountable as an accomplice is also responsible.

Now, this responsibility as an accomplice may be equal and the same as he who actually committed the crimes or there may be responsibility in a different degree, depending on the circumstances as you find them to be. I will further explain this distinction in a moment.

In this case, the State alleges that . . . defendant . . . is equally guilty of the crimes committed by co-defendants [Kenny Mike], Aron Pines and Tahj Pines, because he acted as their accomplice with the purpose that the specific crimes charged be committed.

In order to find . . . defendant . . . guilty of the specific crimes charged, the State must prove beyond a reasonable doubt each of the following elements:

That co-defendants [Kenny Mike], Aron Pines and/or Tahj Pines committed the crimes of armed robbery, robbery, felony murder or possession of a firearm for unlawful purpose; that . . . defendant . . . solicited the co-defendants [Kenny Mike], Aron Pines

and/or Tahj Pines to commit and/or did aid or agree or attempt to aid them in planning or committing the crimes; three, that . . . defendant['s] . . . purpose was to promote or facilitate the commission of the aforesaid crimes; and four, . . . defendant . . . possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act.

. . . .

If you find that . . . defendant . . . with the purpose of promoting or facilitating the commission of the crimes solicited co-defendants [Kenny Mike], Aron Pines and/or Tahj Pines to commit them, or aided, or agreed or attempted to aid them in planning or committing them, then you should consider [defendant] as if he committed the crimes.
. . . . In this case, accomplice liability status should be considered separately for the crimes of armed robbery, robbery, felony murder, and possession . . . of a firearm for unlawful purpose.

The accomplice liability charge provided to the jury tracked the Model Jury Charges (Criminal), "Liability for Another's Conduct" (N.J.S.A. 2C:2-6), Charge # One (rev. May 22, 1995), applicable when a defendant "is charged as accomplice and the jury does not receive instruction on lesser included charges."

Defendant contends that the court should have provided an instruction that tracked the Model Jury Charges (Criminal), "Liability for Another's Conduct" (N.J.S.A. 2C:2-6), Charge # Two (rev. May 22, 1995), applicable when a

54

defendant "is charged as accomplice and jury is instructed as to lesser included charges."[10] That charges states in pertinent part the following:

> Now this responsibility as an accomplice may be equal and the same as he/she who actually committed the crime(s) or there may be responsibility in a different degree depending on the circumstances as you may find them to be. The Court will further explain this distinction in a moment.
>
> . . . .
>
> Now, as I have previously indicated, you will initially consider whether the defendant should be found not guilty or guilty of acting as an accomplice of X with full and equal responsibility for the specific crime(s) charged. If you find the defendant guilty of the specific charge(s), then you need not consider any lesser charge(s).
>
> If, however, you find the defendant not guilty of acting as an accomplice of X on the specific crime(s) charged, then you should consider whether the defendant did act as an accomplice of X but with the purpose of promoting or facilitating the commission of some lesser offense(s) than the actual crime(s) charged in the indictment.
>
> Our law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind. The liability or responsibility of each participant for any ensuing offense is dependent on his/her own state of mind and not on anyone else's.

---

[10] Both of the Model Jury Charges on accomplice liability were revised in June 2021. We quote the charges that applied at the time of defendant's trial.

Guided by these legal principles, and if you have found the defendant not guilty of the specific crime(s) charged, you should then consider whether the defendant is guilty or not guilty as an accomplice on the lesser charge of _____.  I will now explain the elements of that offense to you.  (Here the court may tell the jury what view of the facts could lead to this conclusion).

In considering whether the defendant is guilty or not guilty as an accomplice on this lesser charge, remember that each person who participates in the commission of an offense may do so with a different state of mind and the liability or responsibility of each person is dependent on his/her own state of mind and no one else's.

Defendant did not request Charge # Two and did not object to the final charge provided.  Here again we consider defendant's appellate contentions under the plain error standard, R. 2:10-2, which requires reversal only for errors "of such a nature as to have been clearly capable of producing an unjust result." State v. Trinidad, 241 N.J. 425, 451 (2020) (quoting R. 2:10-2).

An "error in a jury instruction that is 'crucial to the jury's deliberations on the guilt of a criminal defendant' is a 'poor candidate[] for rehabilitation' under the plain error theory."  State v. Burns, 192 N.J. 312, 314 (2007) (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).  But, there must be "legal impropriety in the charge [given] prejudicially affecting the substantial

rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2006). "Rather, '[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Alexander, 233 N.J. at 142 (alteration in original) (quoting Macon, 57 N.J. at 336). For those reasons, "any finding of plain error depends on an evaluation of the overall strength of the State's case." State v. Nero, 195 N.J. 397, 407 (2008).

Applying that standard, under the circumstances of the present case, the absence of a Bielkiewicz charge did not constitute plain error because: the jury was instructed to consider defendant's guilt of armed robbery (first-degree robbery) and robbery (second-degree robbery), defendant was tried individually (separately from his co-defendants), and his defense was alibi.

"When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability." State v. Savage, 172 N.J. 374, 388

(2002) (citation omitted). "By definition an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." State v. White, 98 N.J. 122, 129 (1984). Accordingly, "a jury must be instructed that to find a defendant guilty of a crime under a theory of accomplice liability, it must find that he 'shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'" Bielkiewicz, 267 N.J. Super. at 528 (quoting State v. Fair, 45 N.J. 77, 95 (1965)).

However, it is an "indisputable notion" that "a principal and accomplice, although perhaps liable for the same guilty act, may have acted with different or lesser mental states, thus giving rise to different levels of criminal liability." State v. Ingram, 196 N.J. 23, 41 (1998). Thus, "when an alleged accomplice is charged with a different degree offense than the principal or lesser included offenses are submitted to the jury, the court has an obligation to 'carefully impart[ ] to the jury the distinctions between the specific intent required for the grades of the offense.'" Bielkiewicz, 267 N.J. Super. at 528 (alteration in original) (quoting State v. Weeks, 107 N.J. 396, 410 (1987)). See also State v. Tucker, 280 N.J. Super. 149, 153 (App. Div. 1995) (reversing defendant's conviction for robbery where the trial judge failed to give the jury instructions

incorporating the facts of the case and explaining the possible difference in intent between the principal and the accomplice concerning robbing the victim).

"These principles are particularly important where multiple participants engage in [criminal conduct] with the potential for differing states of mind. In such cases, '[t]he liability of each participant for any ensuing crime is dependent on his own state of mind, not on anyone's else's.'" Cook, 300 N.J. Super. at 486-87 (second alteration in original) (quoting State v. Bridges, 254 N.J. Super. 541, 566 (App. Div. 1992)).

Both defendant and the State acknowledge that the accomplice liability charge provided to the jury was essentially the same instruction provided in Ingram, 196 N.J. at 39-41, which the New Jersey Supreme Court determined did not constitute plain error. Defendant, however, argues that Ingram is distinguishable on its facts because, unlike in Ingram, "[he] was not indicted on second-degree robbery." Thus, according to defendant, "there was a very real risk that the jury believed that because the principal (presumably Kenny Mike) intended to commit an armed robbery, defendant must have, too." We disagree.

In Ingram, the defendant was indicted for, among other things, conspiracy to commit robbery, robbery, felony murder, and theft. Id. at 32. At the defendant's trial, the court's jury instruction on accomplice liability tracked

Model Jury Charge (Charge # One) rather than Model Jury Charge (Charge # Two), notwithstanding the fact that theft was a lesser-included offense of robbery, and defendant was indicted on and convicted of those offenses. Id. at 36, 39. We vacated the defendant's convictions and sentence and remanded for a new trial, finding that because the accomplice instruction tracked Model Jury Charge (Charge # One) rather than Model Jury Charge (Charge # Two), "the jury had been improperly instructed concerning lesser-included offense culpability by accomplices, [and] . . . 'the jury instructions on issues of accomplice liability did not adhere to the requirements of . . . Bielkiewicz. . . .'" Id. at 36-37.

The Supreme Court reversed, finding the error harmless because "the indictment . . . charged defendant with both robbery and theft, and the jury was instructed as to both without objection." Id. at 40. The Court explained:

> In these circumstances, where the indictment substantively charged defendant with both the greater and lesser-included offenses, and the trial court properly instructed the jury in respect of each, the evil Bielkiewicz seeks to guard against—that is, that the jury could have found that one or more of the defendants were guilty of robbery while also finding that one or more of the defendants were guilty only of the lesser-included offense of theft—does not pose the same risk. We therefore conclude that it was not reversible error when the trial court instructed the jury on the elements of the offenses of robbery and theft,

60

together with the elements required for accomplice liability, without also specifically charging that "[o]ur law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind" and that "[t]he liability or responsibility of each participant for any ensuing offense is dependent on his/her own state of mind and not on anyone else's." Model Jury Charge Criminal, "Liability for Another's Conduct/Accomplice ([w]here defendant is charged as accomplice and jury is instructed as to lesser[-]included charges)" (May 22, 1995).

[Ibid. (alterations in original).]

In the present case, although defendant was not indicted on the lesser-included charge of second-degree robbery, the court did charge both first and second-degree robbery, and the jury charge included second-degree robbery among the substantive crimes the jury was to consider in assessing defendant's liability as an accomplice. The verdict sheet also gave the jurors an option to find defendant guilty of the second-degree charge if they acquitted him of the first-degree charge.

Accordingly, like in Ingram, because the jury was provided with the separate elements and requisite mental state of both first and second-degree robbery and charged to consider defendant's guilt as to each separate charge, and was provided an accomplice liability charge that specifically referenced both robbery and armed robbery and explained the requisite mental state necessary

61

to convict defendant as an accomplice for those separate crimes, the omission of a <u>Bielkiewicz</u> charge did not constitute plain error.

Further here, unlike <u>Ingram,</u> defendant was tried separately from his co-defendants and, therefore, the jury was not tasked with considering the mental states of the separate co-defendants.  And, defendant's defense was alibi, i.e., that he did not participate in the crimes, and therefore, there was no basis to distinguish defendant's mental state from that of his co-defendants.  <u>See</u> <u>State v. Norman</u>, 151 N.J. 5, 38-39 (1997) (acknowledging the "remote possibility" that a jury may be "distracted" if they had to distinguish between the different mental states of co-defendants).

At trial, defendant offered no basis or evidence to distinguish his mental state or culpability from that of the co-defendants.  Defendant did not maintain that he acted under a different state of mind.  Rather he "argue[d] that he was not involved in the crime at all," which demonstrated "defendant suffered no prejudice" from a failure to instruct the jury on accomplice liability under <u>Bielkiewicz</u>.  <u>Maloney</u>, 216 N.J. at 105-06, 109-10.  <u>See also</u> <u>State v. Oliver</u>, 316 N.J. Super. 592, 597 (App. Div. 1998) (finding failure to give <u>Bielkiewicz</u> charge not plain error where "there was no evidence presented that the principal may have acted with a different purpose than the accomplice").

For that reason, and because defendant was tried separately from his co-defendants, there was "no evidence from which the jury could have differentiated between [the defendant's] culpability and that of [the co-defendant]" evidence.  State v. Crumb, 307 N.J. Super. 204, 221-22 (App. Div. 1997) (citation omitted).  Because the jurors were not charged with the task of determining any of the co-defendants' guilt, "it is, at best, a remote possibility that they were distracted from their task by a conclusion that the principal had possessed a more culpable intent than the accomplice."  Norman, 151 N.J. at 38-39 (finding defendant not prejudiced by defective accomplice liability charge "where there is no basis in the evidence to infer any difference in defendants' mental states").

VIII.

In Point IV, defendant contends that the court erred by imposing an improper and excessive sentence.  He argues that his sentence is "manifestly excessive and unduly punitive" for a seventeen-year-old, and that the sentencing court failed to properly weigh his youth and "significant history of mental illness" prior to imposing his sentence.  In support of his contentions, defendant relies upon Roper v. Simmons, 543 U.S. 551, 568-69 (2005) (holding that execution of individuals who were under eighteen years of age at time of their

63

capital crimes was prohibited by Eighth and Fourteenth Amendments), Graham

v. Florida, 560 U.S. 48, 82 (2010) (holding that the Eighth Amendment

prohibited life sentences without the possibility of parole for juveniles convicted

of non-homicide offenses), Miller v. Alabama, 567 U.S. 460, 470 (2012)

(holding mandatory life sentences without parole for juveniles violated the Eight

Amendment's prohibition on cruel and unusual punishment), to support his

argument,  and State v. Zuber, 227 N.J. 422, 446 (2017), for the proposition that

a sentencing judge must "take into account how children are different, and how

those differences counsel against irrevocably sentencing them to a lifetime in

prison."  He "acknowledges that current case law does not regard [his] sentence

as the 'practical equivalent' of life without parole," but he argues that "[t]hat

does not mean, however, that the indisputable science underlying Roper,

Graham, Miller, Zuber, and the like, does not apply with equal force to [his]

case."  He asserts that "[a]ge and mental illness should have been given heavy

mitigating weight, warranting a sentence at the bottom of the range, which is a

thirty-year NERA term."  We conclude these contentions are belied by the

record.

The trial court sentenced defendant to a forty-year term of imprisonment,

with an eighty-five percent period of parole ineligibility under NERA.  In

sentencing defendant, the court found two aggravating factors:  three (N.J.S.A. 2C:44-1(a)(3) ("The risk that the defendant will commit another offense")); and nine (N.J.S.A. 2C:44-1(a)(9) ("The need for deterring the defendant and others from violating the law")).  It found only one mitigating factor:  eleven (N.J.S.A. 2C:44-1(b)(11) ("The imprisonment of the defendant would entail excessive hardship to [himself] or [his] dependents.")).  The court also acknowledged defendant's age at sentencing and at the time of the offense, as well as his mental health issues.  But because the crime involved a shooting and a felony murder, the court was "clearly convinced that the aggravating factors substantially outweighed the mitigating factors."

Our review of a sentence is "one of great deference and '[j]udges who exercise discretion and comply with the principles of sentencing remain free from the fear of second guessing.'"  State v. Dalziel, 182 N.J. 494, 501 (2005) (alteration in original) (quoting State v. Megargel, 143 N.J. 484, 494 (1996)). See also Miller, 205 N.J. at 127 ("Appellate review of the length of a sentence is limited.").  "In conducting the review of any sentence, [we] always consider whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'"  State v. Blackmon, 202 N.J. 283,

297 (2010) (second and third alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)).

We will "not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We will affirm a sentence unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting Roth, 95 N.J. at 364-65).]

In sentencing a defendant, the "trial court should identify the relevant aggravating factors [of N.J.S.A. 2C:44-1(a)] and mitigating factors [of N.J.S.A. 2C:44-1(b)], determine which factors are supported by a preponderance of the evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989). Trial courts "are given wide discretion so long as the sentence is within the statutory framework." Dalziel, 182 N.J. at 500.

Contrary to defendant's contention, the court did consider defendant's age at the time of the offense and, in fact, did so in defendant's favor. Just prior to sentencing, the prosecutor argued that even though defendant was only

66

seventeen at the time of the Wiggins homicide, he had an extensive juvenile record, including four prior arrests, and actually gained additional charges after the Wiggins homicide prior to his arrest. The State argued that his age should not be a mitigating factor and that his criminal record should be an aggravating factor and requested a fifty-year term. The court disagreed. While it did not consider defendant's age as a mitigating factor, it refused to use his juvenile record as an aggravating factor because of his youth, and it sentenced him to a term below what the State sought. Defendant received a forty-year sentence with a thirty-four-year parole bar, making him eligible for parole at the age of fifty-three.

As to his mental health issues, defendant did not make any mental illness or diminished capacity arguments during trial or at sentencing. In fact, he successfully argued to his prior counsel and the trial court that he had the capacity to represent himself at trial and that it was in his best interest to do so. Moreover, there was no expert opinion evidence at trial or sentencing that established any mental health issue. See State v. Nataluk, 316 N.J. Super. 336, 349 (App. Div. 1998) (finding in light of defendant's insanity defense and expert opinion evidence, "[i]t is difficult to understand how defendant's condition could not have constituted a mitigating factor"). Defendant cites exclusively to the

presentence report to support his argument of a "significant history of mental illness."

Despite the lack of evidence, it is undisputed that the court acknowledged and considered defendant's mental illness. However, because defendant did not request that his history of mental illness be considered a mitigating factor, and because the court was not presented with an expert medical or psychological opinion, or any other evidence outside the presentence report even suggesting that defendant suffered from mental illness, the sentencing judge did not abuse his discretion in failing to find defendant's history of mental illness as a mitigating factor.

As defendant concedes, his sentence is not a life sentence or its practical equivalent. Zuber, 227 N.J. at 429. And, we conclude it does not shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

68

A-4828-18